# United States Court of Appeals
## For the Second Circuit

---

August Term, 2023

Argued *en banc*: May 22, 2024
Decided: October 31, 2024

No. 20-1666

---

ABDERRAHMANE FARHANE,

*Petitioner-Appellant,*

*v.*

UNITED STATES OF AMERICA,

*Respondent-Appellee.*

---

Appeal from the United States District Court
for the Southern District of New York
No. 18-cv-11973, Loretta A. Preska, *Judge.*

---

Before:     WALKER, WESLEY, CARNEY, SULLIVAN, PARK, NARDINI, MENASHI, LEE, ROBINSON, PÉREZ, NATHAN, MERRIAM, and KAHN, *Circuit Judges.*[*]

CARNEY, *J.,* filed the majority opinion in which WESLEY, LEE, ROBINSON, PÉREZ, NATHAN, MERRIAM, and KAHN, *JJ.,* joined.

---

[*] Judge Walker, Judge Wesley, and Judge Carney, who are senior judges, participated in this rehearing *en banc* pursuant to 28 U.S.C. § 46(c)(1) and 28 U.S.C. § 294(c).

WESLEY, *J.*, filed a concurring opinion in which LEE, ROBINSON, NATHAN, and MERRIAM, *JJ.*, joined.

PÉREZ, *J.*, filed a concurring opinion in which LEE, ROBINSON, NATHAN, and MERRIAM, *JJ.*, joined.

WALKER, *J.*, filed a dissenting opinion in which SULLIVAN, PARK, and MENASHI, *JJ.*, joined in full, and NARDINI, *J.*, joined as to Part I.

PARK, *J.*, filed a dissenting opinion in which SULLIVAN, NARDINI, and MENASHI, *JJ.*, joined.

NARDINI, *J.*, filed a dissenting opinion.

Over a decade ago, the Supreme Court ruled that the Sixth Amendment requires criminal defense counsel to advise her client whether a guilty plea carries a risk of deportation. Today we hold that the Sixth Amendment entitles a naturalized U.S. citizen facing the risk of deportation following denaturalization to no less protection than a noncitizen facing the risk of deportation. A risk of denaturalization cannot be decoupled from a risk of deportation. A naturalized U.S. citizen considering whether to enter a guilty plea has a constitutional right to be advised by counsel that he may lose his citizenship and be banished from the country as a result.

Petitioner-Appellant Abderrahmane Farhane came to the United States almost thirty years ago, settling with his family in Brooklyn. He became a naturalized U.S. citizen in 2002. In 2006, he pleaded guilty on advice of counsel to serious crimes and served over eleven years in federal prison as a result. The government filed a complaint for denaturalization against him in 2018, over a year after his release from prison, based on conduct admitted to in his plea. Upon learning of the government's intent to denaturalize him, Farhane moved to vacate his plea, conviction, and sentence under 28 U.S.C. § 2255. He asserted an ineffective assistance of counsel claim, alleging that his trial counsel never advised him of the risk of denaturalization and thus, removal, and that he would not have agreed to plead guilty had he known of this risk. The District Court (Preska, J.) denied his motion. On appeal, a divided panel affirmed the denial.

In these en banc proceedings, we **VACATE** the decision of the prior panel Majority; **VACATE** the judgment of the District Court denying habeas relief to Farhane; and **REMAND** the case to allow the District Court to reevaluate Farhane's *Strickland* claim consistent with this opinion.

RAMZI KASSEM (Naz Ahmad, Mudassar Toppa, CLEAR
Project, Main Street Legal Services, Inc., CUNY School
of Law, Long Island City, NY; Alan E. Schoenfeld,
Emily Barnet, Sandra Redivo, Trena M. Riley, Dylan
Reichman, Wilmer Cutler Pickering Hale and Dorr
LLP, New York, NY; Thad Eagles, Jeremy W. Brinster,
Wilmer Cutler Pickering Hale and Dorr LLP,
Washington, DC; Asma S. Jaber, Wilmer Cutler
Pickering Hale and Dorr LLP, Boston, MA, *on the
brief*), *for Petitioner-Appellant Abderrahmane Farhane*.

KARL METZNER (Jun Xiang, Hagan Scotten, *on the brief*), *for*
Damian Williams, United States Attorney for the
Southern District of New York, New York, NY, *for
Respondent-Appellee United States of America*.

John C. Yang, Niyati Shah, Marita Etcubañez, Asian
Americans Advancing Justice, Washington, DC;
Andrew Z. Michaelson, Mateo de la Torre, King &
Spalding LLP, New York, NY, *for Amicus Curiae Asian
Americans Advancing Justice in Support of Petitioner-
Appellant Abderrahmane Farhane*.

Andrew Wachtenheim, Nabilah Siddiquee, Immigrant
Defense Project, New York, NY, *for Amicus Curiae
Immigrant Defense Project in Support of Petitioner-
Appellant Abderrahmane Farhane*.

Joel B. Rudin, Matthew A. Wasserman, National Association
of Criminal Defense Lawyers, New York, NY; Richard
D. Willstatter, New York State Association of Criminal
Defense Lawyers, White Plains, NY; S. Isaac Wheeler,
Federal Defenders of New York, Inc., New York, NY,
*for Amici Curiae National Association of Criminal Defense
Lawyers, New York State Association of Criminal Defense
Lawyers, Federal Defenders of New York, Inc., Federal
Public Defender's Office for the Western District of New*

*York, Office of the Federal Public Defender for the District of Connecticut, Office of the Federal Public Defender for the District of Vermont, and Office of the Public Defender for the Northern District of New York in Support of Petitioner-Appellant Abderrahmane Farhane.*

Alyssa Barnard-Yanni, Andrew D. Silverman, Daniel A. Rubens, Orrick, Herrington & Sutcliffe LLP, New York, NY; Lauren A. Weber, Orrick, Herrington & Sutcliffe LLP, Seattle, WA, *for Amici Curiae Professors of Criminal Law, Criminal Procedure, and Immigration Law in Support of Petitioner-Appellant Abderrahmane Farhane.*

———————

CARNEY, *Circuit Judge*:

In these en banc proceedings, we consider whether a naturalized United States citizen has a Sixth Amendment right to be advised by counsel that he may be denaturalized and deported as a result of his entry of a guilty plea. In its 2010 decision in *Padilla v. Kentucky*, 559 U.S. 356, the Supreme Court ruled that the Sixth Amendment requires criminal defense counsel to advise her client of a risk of deportation associated with such a plea. Today we hold that the Sixth Amendment entitles a naturalized U.S. citizen facing the risk of deportation following denaturalization to no less protection than a noncitizen facing the risk of deportation. Deportation following denaturalization proceedings is a severe, adverse immigration consequence that is covered by *Padilla*. To provide constitutionally effective advice, counsel must address the risk of this consequence with her naturalized citizen client before he decides to enter a guilty plea.

Like most courts, ours has generally drawn a distinction between "direct" and "collateral" consequences of a conviction to provide a useful boundary between what the Sixth Amendment requires counsel to address (the possible sentence of incarceration, for example, is a "direct" consequence) and what counsel need not address (the loss of an occupational license, on the other hand, is likely "collateral"). In

the past, we have treated adverse immigration consequences including deportation as collateral, being beyond both the power of the sentencing court itself to impose and perhaps beyond a criminal defense counsel's presumptive area of expertise. *See Michel v. United States*, 507 F.2d 461, 465–66 (2d Cir. 1974).

In *Padilla*, however, the Supreme Court disavowed that binary framework as a tool for assessing counsel's obligations when permanent removal from the country was a possible consequence. That immigration result was too severe, its imposition too closely connected with the criminal process, and its effect upon families too drastic, the Court reasoned, to be lumped categorically together with other "collateral" consequences of a guilty plea. Accordingly, the Court determined that counsel has a constitutional duty to advise her client on this subject.

Accepting this premise in Padilla's case, and then applying the principles established in *Strickland v. Washington*, 466 U.S. 668 (1984), to govern ineffective assistance claims, the Court found that counsel fell below objective standards of competence by neglecting to alert Padilla that his plea agreement with the government would open the door to his removal from the country. That risk, the Court said, could not constitutionally be ignored by counsel. Nor was affirmative misadvice necessary to raise the constitutional concern, it stressed: silence on the subject breached the Sixth Amendment duty to advise. The Court explained that the prospect of removal from the country may be more important to a defendant than time served behind bars, and counsel bears a duty at least to call to her client's attention the risk of such serious adverse immigration consequences.

In the government's 2023 fiscal year, 878,500 persons became U.S. citizens. In the decade from 2012 to 2023, the United States naturalized more than 7.7 million persons.[1] Those individuals earned that cherished status and swore allegiance to the Constitution after a lengthy, multi-layered process that calls for determination and commitment. More will do so this year. If it is later determined that a naturalized citizen obtained his citizenship by fraud or false statements, the law provides a mechanism by which that citizenship may be revoked. *See* 8 U.S.C. § 1451. But the Constitution has long been understood to protect naturalized citizens—even those who run afoul of our criminal laws—just as it does U.S.-born citizens, affording each the effective advice of counsel when they are caught up in the criminal process. As the Court long ago observed in *Schneider v. Rusk*, aside from the Constitution's requirement that only natural-born citizens are eligible to be President, a naturalized citizen "possess[es] all the rights of a native citizen, and stand[s], in the view of the constitution, on the footing of a native." 377 U.S. 163, 166 (1964) (internal quotation marks omitted).

We now reaffirm that understanding and decide that, applying *Padilla* and its clarifying companion case, *Chaidez v. United States*, 568 U.S. 342 (2013), criminal defense attorneys have a Sixth Amendment obligation to inquire into and advise a naturalized citizen client of any risk of deportation following denaturalization proceedings that accompany the client's guilty plea, just as they do for a deportation risk facing a noncitizen client. If the plea carries such a risk and counsel has failed to address it, then the two-pronged *Strickland* test applies: we ask whether counsel's performance fell below an objective standard of reasonableness at the time, and whether the client has shown that he was prejudiced by counsel's deficient performance. The outcome of a

---

[1] U.S. Citizenship & Immigr. Servs., *Naturalization Statistics*, https://www.uscis.gov/citizenship-resource-center/naturalization-statistics (last updated May 9, 2024).

Sixth Amendment challenge to the conviction will hinge on the answers to those questions.

Petitioner-Appellant Abderrahmane Farhane came to the United States from Morocco almost thirty years ago, in 1995. He was naturalized in 2002. He has six children, two of whom were naturalized through him and two of whom are U.S. citizens through their birth here. In 2006, Farhane pleaded guilty on advice of counsel to serious crimes charged in the Southern District of New York. He served more than eleven years in federal prison as a result.

Within a year of his release from prison, however, the government began proceedings to denaturalize him based on conduct admitted to in his plea agreement— proceedings acknowledged to be a precursor to deportation. Farhane then brought a challenge by motion for habeas relief under 28 U.S.C. § 2255. He asserted that, contrary to his Sixth Amendment rights, his counsel never advised him of the risk of denaturalization and deportation, and that he would not have agreed to enter the plea had he known that he might be banished from this country and separated from his family as a result. The District Court denied his motion. On appeal, a divided prior panel affirmed the denial.

On review, we VACATE the decision of the prior panel Majority; VACATE the judgment of the District Court denying habeas relief to Farhane; and REMAND the case to allow the District Court to address the *Strickland* ineffective assistance questions in the first instance, in the context of the Sixth Amendment understandings set forth here.

## I.    Factual and procedural background

### A.    <u>Farhane's immigration history</u>

Abderrahmane Farhane immigrated to this country from Morocco in 1995, at about age 40, after visiting the country on three occasions beginning in the late 1980s. He and his wife and four Moroccan-born children settled in Brooklyn, where he ran a small bookstore.

In March 2001, he applied to become a naturalized U.S. citizen by completing and submitting the form provided for that purpose by the Immigration and Naturalization Service ("INS"). Among the many questions that form requires the applicant to answer is one that is particularly broad: "Have you ever . . . knowingly committed any crime for which you have not been arrested?" Farhane checked the box marked "No" in response. About one year later, in March 2002, he participated in an in-person interview with an INS official as his next step toward naturalization. There, he was asked and repeated under oath his negative answer to that question. Then, on April 19, 2002, after swearing to the veracity of that and other answers given on the form a third time, he took the oath of citizenship and became a naturalized U.S. citizen.

In time, his answers in March 2001 and in March and April 2002 to that sweeping question became one of two bases for the government's denaturalization complaint against him: that by answering "No," he purportedly concealed material facts related to his application; and that the material facts that the "No" concealed further demonstrated, the government alleged, that he was not a person of good moral character. On these two bases, the government later charged, a federal district court was bound to revoke his naturalization.

B.    Farhane's criminal conduct, guilty plea, and sentence

In 2005, the U.S. Attorney for the Southern District of New York charged Farhane by complaint with providing false statements in violation of 18 U.S.C. § 1001. In 2006, a superseding indictment that now named other codefendants (Tarik Shah, Rafiq Sabir, and Mahmud Faruq Brent) charged Farhane with two criminal counts: in Count 5, conspiracy to provide material support for terrorism, *see* 18 U.S.C. § 2339A; and in Count 6, making false statements to law enforcement officers in connection with a terrorism investigation, *see id.* § 1001(a)(2).[2] The superseding indictment further alleged that from about November 2001 through June 2005, Farhane and Shah "agreed with each other to assist another individual to transfer money from the United States to locations overseas to purchase weapons and communications equipment for jihadists in Afghanistan and Chechnya, and attempted to hide the nature of that assistance from United States authorities." App'x at 75–76. The "[]other individual" referred to in this count was a confidential informant for the FBI. The record contains no evidence that any money was transferred overseas in connection with the charged conspiracy. Count 5 carried a statutory maximum sentence of fifteen years.

The allegations of Count 6 rested primarily on a conversation that took place in 2005 between Farhane and an FBI agent. In that conversation, Farhane denied having a conversation with the confidential informant about sending money overseas to jihadists or meeting the informant in person. He falsely explained that he had provided a phone number to the informant merely to help that person send money overseas by wire transfer at lower cost. (The conversation in question was one referred to in the

---

[2] The superseding indictment appears to have been the first indictment obtained against Farhane. But because it was entered on the District Court's docket as a "superseding indictment," App'x at 46, we (like the parties) refer to it in this way as well.

conspiracy count, Count 5.) Count 6 carried a statutory maximum sentence of eight years.

On November 9, 2006, on advice of counsel, Farhane entered a plea agreement in which he pleaded guilty to one count of conspiracy to commit money laundering, *see* 18 U.S.C. § 371, and one count of making materially false statements involving international terrorism, *see id.* § 1001(a)(2). The agreement stipulated a maximum sentence of 13 years—the combined statutory maximum for the counts of conviction. In pleading guilty, he also waived his right to appeal or attack collaterally any sentence at or below the stipulated maximum. He had no known prior criminal record.

At his change-of-plea hearing, Farhane stated that he was guilty of the conspiracy charge because he had "agreed with others in the month[s] of November and December of 2001 to transfer money for mujahideen in Afghanistan and Chechnya." App'x at 194. As to the false statements charge, he acknowledged that in 2005 he gave false answers when questioned as part of an FBI terrorism investigation.

In April 2007, the District Court (Preska, J.) entered judgment against Farhane and sentenced him to the statutory maximum term of 13 years' incarceration and a two-year term of supervised release. Farhane timely filed a notice of appeal and expressed to appellate counsel his desire to raise ineffective assistance and other claims related to the District Court proceedings. But in 2008, his appointed appellate counsel moved under *Anders v. California*, 386 U.S. 738 (1967), to withdraw the appeal, citing the waiver in Farhane's plea agreement and other considerations. Three years later, in February 2011, after the trial and appeal of Farhane's codefendant Sabir, we granted counsel's *Anders*

motion and dismissed Farhane's appeal in a brief order.[3] *See United States v. Farhane (Sabir)*, 634 F.3d 127, 132 n.2 (2d Cir. 2011).

Meanwhile, Farhane was incarcerated for eleven years. In May 2017, after his release from prison, he began his two-year term of supervised release.

C.     The 2018 denaturalization proceedings

In July 2018, just over a year after his release from prison and into his term of supervised release, the government advised Farhane that it had begun a civil denaturalization action against him. Proceeding under 8 U.S.C. § 1451(a), the government alleged in its civil complaint that Farhane had obtained his naturalization unlawfully. The complaint contained two pivotal assertions, both based on Farhane's 2006 guilty plea. First, it asserted that his guilty plea conclusively showed that Farhane knowingly committed crimes pre-dating his April 2002 naturalization. Farhane's admission in 2006 to those pre-April 2002 crimes, in turn, established that he gave false testimony under oath in his March 2002 INS interview. Thus, he had procured his naturalization by concealing a material fact: that he had committed a crime for which he had not been arrested.

Second, it asserted that this false testimony and his pre-April 2002 criminal acts themselves conclusively established that he could not show in April 2002 that he was a "person of good moral character," as he had to, to naturalize then. App'x at 315–17. No more was needed to require the court to enter the requested order of denaturalization: the government reminded the District Court that it enjoyed no equitable discretion to second-guess these facts and deny entry of a judgment of denaturalization against

---

[3] Counsel's *Anders* motion in 2008 pre-dated the 2010 *Padilla* decision, and so did not address its import; our 2011 order made no mention of *Padilla*.

Farhane as a naturalized citizen whose "citizenship was procured illegally or by willful misrepresentation of material facts." *Id.* at 314.

D.      Farhane's § 2255 motion

Four months later, in December 2018, Farhane moved under 28 U.S.C. § 2255 to vacate his plea and sentence. In his accompanying affidavit, he averred that his trial counsel did not advise him that his plea carried a risk of denaturalization and deportation. Farhane asserted:

> I would not have entered a guilty plea if [counsel] had told me that I could lose my U.S. citizenship as a result. I would not have entered a guilty plea if [counsel] had told me that I could face deportation as a result. I would not have entered a guilty plea if [counsel] had told me that my children could lose their U.S. citizenship as a result.

App'x at 299 (para. numbering omitted). He alleged that counsel knew he was a naturalized citizen and that counsel had so advised the court at Farhane's first detention hearing, in 2005. Yet counsel never alerted him to the possibility of denaturalization and deportation raised by his plea or advised him with respect to that risk. On this basis, Farhane submitted, his plea was invalid.

The government opposed Farhane's motion. It maintained that the Sixth Amendment does not require counsel to advise about "collateral consequences" such as denaturalization. As to his risk of deportation, it responded, "That argument is meritless because, at the time of the plea, Farhane was a citizen and therefore could not be deported." S.D.N.Y. No. 1:18-cv-11973 Doc. 22, at 14 n.9. It further suggested that the criminal case outcome would have been the same because, even had he been advised of the risk of denaturalization and deportation, he would have chosen to take the 13-year term of imprisonment over the 23-year term to which he was exposed absent the plea agreement. Farhane countered that the stakes to him were such that he would have chosen to go to trial and take the chance of receiving a longer sentence.

The District Court denied Farhane's § 2255 motion. It explained that it saw nothing in the record to suggest that his lawyer "should have known" about his exposure to denaturalization. *United States v. Farhane*, No. 18 Civ. 11973, 2020 WL 1527768, at *2 (S.D.N.Y. Mar. 31, 2020). *Padilla* had been handed down in the interim between Farhane's sentencing and his § 2255 motion (and before the judgment in the criminal case against him became final). But *Padilla* had no bearing on Farhane's case, the Court reasoned, because Farhane's "conviction itself did not give rise to an imminent risk of deportation, as was the case in *Padilla*." *Id.* Instead, Farhane's risk of denaturalization "stemmed from his misrepresentations . . . and his having illegally procured naturalization." *Id.* And in any event, although Farhane's counsel knew Farhane was naturalized, he had "no basis for suspecting that the guilty plea could have immigration consequences[.]" *Id.*

In August 2023, a divided panel of this Court affirmed the District Court's denial of relief, concluding that civil denaturalization is a collateral and not a direct consequence of a conviction, and that the Sixth Amendment therefore imposes no obligation on attorneys to warn of that risk. *See Farhane v. United States*, 77 F.4th 123, 126 (2d Cir. 2023). In 2024, we ordered this rehearing en banc.

The denaturalization proceedings brought against Farhane have been stayed pending resolution of his appeal in our Court.

## DISCUSSION

We first consider whether, under *Padilla*, the Sixth Amendment requires a criminal defense attorney to inform a naturalized citizen client whether his guilty plea carries a risk of denaturalization and deportation. Concluding that it does, we then turn to Farhane's *Strickland* claim and decide to remand his case to the District Court. On remand, the District Court should allow the parties to develop the record further and

conduct an evidentiary hearing as needed. It should then reevaluate, in light of the Sixth Amendment understandings set forth here, whether Farhane has established two propositions: that his lawyer's conduct was objectively unreasonable; and that he was prejudiced as a result.

Whether defense counsel rendered ineffective assistance presents a mixed question of law and fact that we review de novo. *Doe v. United States*, 915 F.3d 905, 910 (2d Cir. 2019).

**I.    The Sixth Amendment requires an attorney for a naturalized U.S. citizen to provide advice about the risk of denaturalization and deportation flowing from the citizen's guilty plea.**

The question we confront is whether Farhane's Sixth Amendment right to counsel was violated when his attorney failed to inform him that his guilty plea could lead to his denaturalization and deportation. The Supreme Court has described the analysis undertaken in *Padilla* as follows: "[P]rior to asking *how* the *Strickland* test applied ('Did this attorney act unreasonably?'), *Padilla* asked *whether* the *Strickland* test applied ('Should we even evaluate if this attorney acted unreasonably?')." *Chaidez*, 568 U.S. at 349 (emphasis in original). We take the same approach here, considering first whether the Sixth Amendment requires counsel to advise a naturalized citizen client of the risk of denaturalization and related deportation that may result from a guilty plea.

We conclude that, under *Padilla*, a naturalized U.S. citizen has a Sixth Amendment right to be advised by counsel that he may be denaturalized and deported as a result of his entry of a guilty plea.[4] Because a guilty plea to a conviction that

_____

[4] The Sixth Amendment provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Sixth Amendment right has long been recognized to encompass the right to effective counsel in deciding whether to enter a guilty plea. *See Lafler v. Cooper*, 566 U.S. 156, 162

exposes a criminal defendant to the risk of denaturalization necessarily exposes him to the risk of deportation, a straightforward application of *Padilla*—holding that "counsel must inform her client whether his plea carries a risk of deportation," 559 U.S. at 374— resolves the question. Alternatively, because denaturalization is a "particularly severe" consequence, and "nearly an automatic result" of a guilty plea to certain offenses, advice regarding denaturalization, like advice regarding deportation, "is not categorically removed from the ambit of the Sixth Amendment right to counsel." *Id.* at 365–66. To provide effective representation, counsel must advise her client as to that paired set of serious adverse immigration consequences by at least flagging the risk. As many have observed, the risk of banishment may weigh more heavily in a criminal defendant's assessment of his options than any particular sentence of incarceration. *See, e.g.*, *Lee v. United States*, 582 U.S. 357, 370 (2017) ("[W]e have recognized that preserving the client's right to remain in the United States may be more important to the client than any potential jail sentence." (internal quotation marks omitted)). This is so whether the defendant is a noncitizen weighing the risk of deportation or a naturalized citizen weighing the risk of denaturalization and deportation.

In sum, whether viewed as a direct application of *Padilla*'s holding or a necessary result of its core reasoning, the constitutional bottom line is clear: criminal defense counsel has a Sixth Amendment duty to advise a naturalized citizen client that entering a guilty plea exposes him to a risk of denaturalization and deportation.[5]

---

(2012); *Hill v. Lockhart*, 474 U.S. 52, 58–59 (1985); *Kovacs v. United States*, 744 F.3d 44, 49 (2d Cir. 2014).

[5] Congress's 1996 amendments to our immigration laws "involved a change in nomenclature; the statutory text now uses the term 'removal' rather than 'deportation.'" *Padilla*, 559 U.S. at 364 n.6. We use these terms interchangeably throughout.

The government argues that a summary application of the familiar distinction between direct and collateral consequences of a conviction places the risk of denaturalization and deportation outside the scope of the Sixth Amendment. Civil denaturalization falls into the "collateral" pile, the government asserts, urging on this analysis that counsel simply has no constitutional obligation to advise clients of such a risk. Further, the government maintains, *Padilla* addressed the Sixth Amendment rights to effective counsel of noncitizens only and said nothing about the rights of naturalized citizens. We reject these contentions. As previewed above and as detailed below, the government's arguments cannot be reconciled with *Padilla*.

A.     Farhane's guilty plea carried a risk of deportation.

Applying the Supreme Court's holding in *Padilla* answers the question before us. A risk of denaturalization simply *is* a risk of deportation.[6] And, as *Padilla* instructs, to satisfy the Sixth Amendment's requirement of effective assistance in a criminal prosecution, "counsel must inform her client whether his plea carries a risk of

_____

[6] *See* Anthony D. Bianco et al., *Civil Denaturalization: Safeguarding the Integrity of U.S. Citizenship*, 65 U.S. Attys' Bull. 5, 17 (July 2017) (stating that the government typically "does not expend resources on civil denaturalization actions unless the ultimate goal is the removal of the defendant from the United States"). Judge Walker's Dissent takes issue with our reliance on the government's representation in the noted publication that it typically does not pursue civil denaturalization unless it also intends to seek deportation. It argues that the representation deserves little weight, reasoning that the government's process is "subject to change depending on the presidential administration." Dissent (Walker, *J.*) at 8 n.7. We agree that, as that Dissent observes, "[o]ur Sixth Amendment analysis should not depend on the varying prosecutorial priorities of the Department of Justice." *Id*. The Majority's Sixth Amendment analysis does not depend, however, on potentially variable prosecutorial priorities. Rather, the risk that triggers the Sixth Amendment duty here derives from the statutory schemes that render certain individuals subject to deportation. *See infra* nn.7, 9, 11. In contrast, no statutory scheme compels the result reached by Judge Walker's Dissent. The Sixth Amendment interpretation and the direct/collateral framework that it invokes represent doctrines adopted by the lower courts over the years. Applying those doctrines alone would leave naturalized citizens uniquely, and paradoxically, without the Sixth Amendment protection that *Padilla* affords.

deportation." 559 U.S. at 374. Thus, applying *Padilla* to the case at bar, it is clear that the Sixth Amendment requires criminal defense counsel to advise his client of the risk of denaturalization and the associated heightened risk of deportation that flow from his guilty plea.

Farhane's case illustrates why a guilty plea that carries a risk of denaturalization necessarily carries a risk of deportation. The government initiated civil denaturalization proceedings against him in 2018, soon after his release from prison, using the admissions in his 2006 guilty plea as the foundation of its civil complaint. In that complaint, the government charges that Farhane's naturalization was "illegally procured" or "procured by concealment of a material fact or by willful misrepresentation," 8 U.S.C. § 1451(a), referring to the statements Farhane made about his 2001 conduct in his guilty plea.[7] Indeed, in its denaturalization complaint, the

---

[7] "[F]ailure to comply with the statutory prerequisites for naturalization renders [a] certificate of citizenship revocable as 'illegally procured' under 8 U.S.C. § 1451(a)." *Fedorenko v. United States*, 449 U.S. 490, 514 (1981). One such prerequisite is that the applicant be "a person of good moral character" for the five years (the "statutory period") preceding his application for citizenship. 8 U.S.C. § 1427(a)(3). The current standard citizenship application form asks all applicants, "Have you **EVER** committed . . . a crime or offense for which you were **NOT** arrested?" *Maslenjak v. United States*, 582 U.S. 335, 346 (2017) (bold in original), and the form submitted by Farhane used almost identical language, *see* App'x at 334 ("Have you ever . . . knowingly committed any crime for which you have not been arrested?"). By regulation, an admission to having engaged in many types of criminal conduct within the statutory period automatically precludes an applicant from demonstrating the "good moral character" required for naturalization. *See* 8 C.F.R. §§ 316.10(b)(2)(vi) (lack of good moral character if, during the statutory period, the applicant has given false testimony to obtain an immigration benefit), (b)(3)(iii) (lack of good moral character if, during the statutory period, the applicant committed unlawful acts that adversely reflect upon his moral character, or was convicted or imprisoned for such acts).

A naturalized citizen who willfully fails to disclose such conduct (occurring within the statutory period) when applying for citizenship will also have procured his naturalization "by concealment of a material fact or by willful misrepresentation." 8 U.S.C. § 1451(a); *see also Kungys v. United States*, 485 U.S. 759, 767 (1988). Thus, a naturalized citizen who pleads guilty in any context to any such pre-naturalization conduct that occurred within the statutory period—

government argues that Farhane, by way of his guilty plea, "is collaterally estopped from contesting those matters determined by the judgment in the criminal case." App'x at 314. As the government conceded at oral argument in these en banc proceedings, the collateral estoppel effect of Farhane's plea therefore makes it "provably easier" for the government to establish the facts necessary to denaturalize him. *See* En Banc Oral Arg. Tr. at 67:10–13. The court adjudicating the government's denaturalization petition will have "no discretion to excuse the conduct." *Fedorenko v. United States*, 449 U.S. 490, 517 (1981). The government admonished the District Court accordingly in its denaturalization complaint against Farhane. *See* App'x at 314. And once his citizenship is revoked, Farhane will be subject to removal as a noncitizen convicted of an aggravated felony. *See* 8 U.S.C. §§ 1101(a)(43)(D), (U), 1227(a)(2)(A)(iii); *Sessions v. Dimaya*, 584 U.S. 148, 153 (2018) ("[R]emoval is a virtual certainty for an alien found to have an aggravated felony conviction, no matter how long he has previously resided here.").[8]

---

including, for example, a guilty plea to driving while under the influence, *see* U.S. Citizenship & Immigr. Servs., *Instructions for Application for Naturalization*, at 21 (Apr. 1, 2024)—will necessarily have illegally procured his citizenship and failed to disclose that conduct when applying for citizenship. *See* 8 U.S.C. §§ 1427(a), 1451(a). That guilty plea makes the citizen vulnerable to a civil complaint under the denaturalization statute, which provides that "[i]t shall be the duty of the United States" government "to institute [denaturalization] proceedings" in these circumstances. *Id.* § 1451(a).

[8] As Judge Wesley notes in concurrence, two Circuits have held that a noncitizen is not removable under the aggravated felony provision, 8 U.S.C. § 1227(a)(2)(A)(iii), if the person was a U.S. citizen at the time of conviction. Concurrence (Wesley, J.) at 1 n.1. *See Singh v. Att'y Gen. of U.S.*, 12 F.4th 262 (3d Cir. 2021); *Hylton v. U.S. Att'y Gen.*, 992 F.3d 1154 (11th Cir. 2021). Even if this Circuit were to adopt our sister Circuits' construction of the aggravated felony provision— an issue not presented to the en banc court—Farhane would still face a risk of deportation. As Farhane's counsel conceded at oral argument, if now denaturalized, Farhane would still be deportable on grounds other than the instant conviction. En Banc Oral Arg. Tr. at 77:24–78:3. Moreover, the unsettled nature of the question of the aggravated felony provision's applicability to naturalized citizens further demonstrates the risk facing those like Farhane, who must assess whether to enter a guilty plea. *Padilla* instructs that even such an "unclear or

The government's request that we apply *Padilla* only where a "direct linkage" exists between a conviction resulting from a guilty plea and deportation cannot be reconciled with *Padilla*. En Banc Oral Arg. Tr. at 43:7–15. To be sure, for a naturalized citizen defendant, the risk of deportation is one step further removed from entry of a guilty plea than it is for a noncitizen: the government must obtain his denaturalization before it can initiate removal proceedings. The *Padilla* Court, however, expressly ruled that the Sixth Amendment requires counsel to advise her client regarding the deportation consequences of his plea, whether or not those consequences are clear or certain. In situations where "the law is not succinct and straightforward," the Court clarified, "a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences." *Padilla*, 559 U.S. at 369; *see also id.* at 375 (Alito, J., concurring) (expressing view that counsel "must . . . advise the defendant that a criminal conviction may have adverse immigration consequences and that, if the alien wants advice on this issue, the alien should consult an immigration attorney," but that counsel need not "explain what those consequences may be"). Where entry of an order of deportation is a step removed from the guilty plea, as it is for naturalized citizen defendants, the path from plea to eventual deportation may indeed be less straightforward than that faced by Padilla. But that alone does not remove advice regarding the risk from the ambit of the Sixth

---

uncertain" risk of deportation is sufficient to trigger the Sixth Amendment duty to advise. *Padilla*, 559 U.S. at 369. The Dissent attempts to downplay the connection between Farhane's plea and his denaturalization by emphasizing the defenses that Farhane might still theoretically raise against the three denaturalization counts in the government's petition. Dissent (Walker, *J.*) at 6–7. Farhane's counsel stated at oral argument in our en banc proceedings that he is not aware of any actually viable defenses to those counts based on current caselaw. En Banc Oral Arg. Tr. at 78:4–79:5. The merits of those defenses are not before us, of course. It suffices to note that the mere possibility that the government might be unsuccessful in its attempts to denaturalize or deport Farhane does nothing to negate the fact that Farhane faced a cognizable, serious risk when he decided to enter his guilty plea.

Amendment: "Lack of clarity . . . does not obviate the need for counsel to say *something* about the possibility of deportation, even though it will affect the scope and nature of counsel's advice." *Id.* at 369 n.10 (emphasis added).

Farhane's guilty plea carried not only the risk of denaturalization but also, and inevitably, the risk of deportation. Under *Padilla*, counsel advising a client in Farhane's circumstances is constitutionally obligated to advise that his plea "may carry a risk of adverse immigration consequences." *Id.* at 369.

B.  <u>The direct/collateral distinction is also "ill suited" to evaluating the risk of denaturalization, and so counsel has a constitutional obligation to advise of such a risk.</u>

A faithful application of *Padilla*'s underlying reasoning similarly compels the conclusion that advice about the risk of denaturalization falls within the scope of the Sixth Amendment. In finding deportation "uniquely difficult to classify as either . . . direct or . . . collateral" and thus "ill suited" to categorization under the direct/collateral framework, *id.* at 366, the *Padilla* Court highlighted two aspects of the consequence. First, it stressed that deportation is a "particularly severe penalty." *Id.* at 365 (internal quotation marks omitted). Second, it observed that deportation was "nearly an automatic result for a broad class of noncitizen offenders," emphasizing "its close connection to the criminal process" and noting how "[o]ur law has enmeshed criminal convictions and the penalty of deportation for nearly a century." *Id.* at 365–66. The same considerations apply fully to the consequence of denaturalization.

It is not disputed here that denaturalization is a "particularly severe" consequence. *Id.* at 365. The Supreme Court "has long recognized the plain fact that to deprive a person of his American citizenship is an extraordinarily severe penalty." *Klapprott v. United States*, 335 U.S. 601, 612 (1949); *see also id.* at 616–17 (Rutledge, J., concurring) (stating that "[t]o take away a man's citizenship deprives him of a right no

less precious than life or liberty" and that "in its wake may follow the most cruel penalty of banishment"). If Farhane loses his citizenship, he loses his home of over thirty years, his business, his life with his family; in addition, two of his children, who derived citizenship through him, stand to lose their citizenship here as well. *See* 8 U.S.C. § 1451(d).[9]

For naturalized citizens who plead guilty to criminal conduct pre-dating their naturalization—and within the statutory period—their convictions create a "nearly . . . automatic" risk of denaturalization. *See Padilla*, 559 U.S. at 366. Farhane's circumstances exemplify this fact. As outlined above, he admitted through his guilty plea that, beginning in November 2001, he conspired to commit money laundering in violation of 18 U.S.C. § 371. In the denaturalization proceedings that the government initiated against him soon after his release from his thirteen-year sentence, he will be unable to contest or explain in any way the operative facts: that he illegally procured his citizenship based on criminal conduct occurring shortly before his 2002 naturalization, and that he concealed a material fact or made a willful misrepresentation regarding that criminal conduct by failing to disclose it in his March 2002 interview. *See* 8 U.S.C. § 1451(a). And, as already noted, the court adjudicating the government's denaturalization petition will have no discretion to excuse the conduct.[10] Thus,

---

[9] When an individual is denaturalized based on concealment of a material fact or willful misrepresentation in procuring naturalization—as would be the case with Farhane—any person claiming citizenship through such denaturalized person "shall be deemed to have lost . . . citizenship." 8 U.S.C. 1451(d); *see also* Bianco et al., at 16 ("If the defendant's spouse or children obtained citizenship based on the defendant's naturalization, the denaturalization judgment revokes the spouse's and children's naturalization as a matter of law.").

[10] The lack of discretion afforded the courts "to ameliorate unjust results on a case-by-case basis" also informed the *Padilla* Court's analysis with respect to deportation. 559 U.S. at 362. For the better part of the twentieth century, the Court stated, sentencing judges had "conclusive authority to decide whether a particular conviction should be disregarded as a basis for deportation," *id.* (quoting *Janvier v. United States*, 793 F.2d 449, 452 (2d Cir. 1986)), through a

Farhane's guilty plea and conviction, on one hand, and the consequence of denaturalization, on the other, are "enmeshed"; and denaturalization has a "close connection to the criminal process." *Padilla*, 559 U.S. at 365–66.

The government attempts to limit *Padilla*'s application, contending that denaturalization is not as "nearly . . . automatic" a consequence of a conviction as is deportation. *Id.* at 366. But its arguments in this vein fail to persuade.

*First*, we reject the government's suggestion that "nearly . . . automatic" means "definite" or "immediate." *Id.*; *see also* Gov't Br. at 18 (maintaining that civil denaturalization is neither a "definite" or "immediate" consequence of a criminal conviction). As discussed above, the Court in *Padilla* did not limit its holding to cases in which deportation would certainly or immediately follow a criminal conviction. *See Padilla*, 559 U.S. at 369 (clarifying that counsel's Sixth Amendment duty to advise attaches even to cases where "the deportation consequences of a particular plea are unclear or uncertain"). Instead, it repeatedly stressed that constitutionally effective counsel has an obligation to warn of a "*risk* of deportation." *Id.* at 366 (emphasis added); *see also id.* at 367 ("The weight of prevailing professional norms supports the view that counsel must advise her client regarding the *risk* of deportation." (emphasis added)); *id.* at 374 ("[W]e now hold that counsel must inform her client whether his plea carries a *risk* of deportation." (emphasis added)). Put simply, *Padilla* was focused on cases

---

procedure known as a judicial recommendation against deportation, or JRAD. *Id.* at 361–62. But by 1990, Congress had entirely eliminated the JRAD procedure. *Id.* at 363. Courts thus went from having ample discretion to grant relief to deportable noncitizens to having none at all. *Id.* at 363–64. "These changes to our immigration law," the *Padilla* Court observed, "have dramatically raised the stakes of a noncitizen's criminal conviction," and "accurate legal advice for noncitizens accused of crimes has never been more important." *Id.* at 364. These concerns carry equal weight in the denaturalization context, in which courts, too, have no discretion to grant relief to naturalized U.S. citizens eligible for denaturalization, even when granting such relief would "ameliorate unjust results." *Id.* at 362.

involving advice as to whether a guilty plea would make a criminal defendant *deportable*, not just on cases where deportation would inescapably follow. *See, e.g., id.* at 360 ("We agree with Padilla that constitutionally competent counsel would have advised him that his conviction for drug distribution made him *subject to* automatic deportation." (emphasis added)); *id.* at 370 ("When attorneys know that their clients face *possible* exile from this country and separation from their families, they should not be encouraged to say nothing at all." (emphasis added)); *id.* at 373 (observing that "informed consideration of *possible* deportation can only benefit both the [government] and noncitizen defendants during the plea-bargaining process" (emphasis added)). Farhane's guilty plea and conviction created a "nearly . . . automatic" risk of denaturalization, *id.* at 366, because his admissions to criminal conduct in his plea established his ineligibility for naturalization, in accordance with the applicable statutory and regulatory provisions—just as Padilla's guilty plea made him subject to deportation under the relevant immigration laws. That Farhane's plea makes it "provably easier," in the government's words, for the government to denaturalize him renders the risk of denaturalization a sufficiently automatic consequence of his guilty plea, at least under *Padilla*'s reasoning. *See* En Banc Oral Arg. Tr. at 67:10–13.

*Second*, and relatedly, even deportation in Padilla's circumstances is not as "automatic" as the government now makes it out to be. For instance, the government suggests the comparison is invalid because "[c]ivil denaturalization cannot occur unless [it] initiates a separate civil proceeding under 8 U.S.C. § 1451(a)." Gov't Br. at 18. The same is true, however, of deportation proceedings that follow entry of a guilty plea: an additional judicial or agency proceeding is required before deportation will occur. *See* 8 U.S.C. § 1229a; *Padilla*, 559 U.S. at 365 (recognizing that removal is "civil in nature" and "not, in a strict sense, a criminal sanction"). With respect to both denaturalization and

deportation, the consequence is not imposed by the sentencing judge in the predicate criminal case.

Additionally, the government highlights the role that prosecutorial discretion plays in denaturalization proceedings, advising that it "rarely seeks denaturalization, even following criminal convictions." Gov't Br. at 18. But deportation proceedings, too, are initiated by the government through an "exercise of prosecutorial discretion . . . on a case-by-case basis . . . ." Mem. from Sec'y John Kelly, Dep't of Homeland Sec., *Enforcement of the Immigration Laws to Serve the National Interest* 4 (Feb. 20, 2017). Even once the government has placed a noncitizen in removal proceedings, removal is not an entirely foregone conclusion: the Attorney General retains "limited remnants of equitable discretion" to cancel removal, *Padilla*, 559 U.S. at 364, and certain individuals may avoid deportation if they can, for instance, convince their immigration judge that their conviction is not for a qualifying crime of moral turpitude, or establish eligibility for cancellation of removal. And deportation is not necessarily "immediate" in the temporal sense: it can occur long after a conviction renders the noncitizen eligible. *See Restrepo v. Att'y Gen. of U.S.*, 617 F.3d 787, 800–02 (3d Cir. 2010) (concluding that no statute of limitations applies to removal proceedings predicated on a conviction).

The government also contends that a conviction is not a necessary condition for denaturalization: it may obtain an order of denaturalization even without a criminal conviction, so long as it can prove that the defendant committed the underlying conduct that rendered his naturalization "illegally procured," or that the defendant lied about his conduct during the naturalization process, 8 U.S.C. § 1451(a). Again, the same is true of deportation. *See, e.g.*, *id.* § 1227(a)(1), (3)–(6) (providing numerous grounds for deportation not predicated on a criminal conviction). At oral argument in these en banc proceedings, in fact, the government conceded that the Sixth Amendment would apply with respect to counsel's advice to a noncitizen about entering a plea to a *non*removable

offense, where in the course of pleading guilty the defendant would admit to conduct that would make him removable. *See* En Banc Oral Arg. Tr. at 42:5–17. If that is so, we see no reason why, in cases involving the risk of denaturalization, the fact that the conviction itself would not serve as the predicate for denaturalization should remove advice about that consequence from the Sixth Amendment's ambit. In short, the government's asserted distinctions between deportation and denaturalization do not withstand scrutiny.

*Third*, the government's concession at oral argument regarding the applicability of *Padilla* to asylees underscores the weakness of its urged reading of *Padilla*. When asked whether *Padilla*'s holding applies to a noncitizen asylee who is exposed to the risk of deportation because of a criminal conviction, the government answered in the affirmative. *See* En Banc Oral Arg. Tr. at 52:7–8 ("Absolutely, your Honor. They're a noncitizen. *Padilla* applies to any noncitizen."). But the deportation risk faced by asylees who are deciding whether to enter a guilty plea is virtually indistinguishable from that faced by naturalized citizens confronted with the same choice. The path from conviction to removal for asylees, like that for naturalized citizens, comprises two steps: in the case of asylees, the government must first terminate their asylum status before it can remove them.[11]

The similarities between denaturalization and termination of asylum status do not end there. Just as a conviction is not a *necessary* condition for denaturalization (in the sense that an individual can be denaturalized based on conduct admitted to in a

---

[11] Asylees are subject to removal only after their asylum status has been terminated. *See* 8 U.S.C. § 1158(c)(1)(A) (stating that the Attorney General "shall not remove or return" a noncitizen granted asylum); *id.* § 1158(c)(2) (providing a mechanism for terminating asylum); *id.* § 1158(c)(3) (providing that a noncitizen whose asylum status is terminated is subject to any applicable grounds of inadmissibility or removal under 8 U.S.C. § 1182(a) and § 1227(a)).

guilty plea or on a lie about that conduct, even if the conviction itself is not a predicate for denaturalization), a conviction is also not a necessary condition for termination of asylum. The government can terminate asylum on grounds unrelated to a conviction.[12]

And as for the government's contention that a conviction is not a *sufficient* condition for denaturalization and removal, the same is also true for termination of asylum and removal. For example, the government posits that establishing at a denaturalization proceeding that nondisclosure or misrepresentation of a material fact during the naturalization process was "willful" might require an additional showing not already established by the criminal conviction.[13] In the case of asylees, however, to terminate an individual's asylum, the government must likewise prove more than the fact of a conviction of a qualifying crime: it must show that the asylee "constitutes a danger to the community of the United States." 8 U.S.C. § 1158(b)(2)(A)(ii).[14] Accordingly, the government's concessions with respect to the Sixth Amendment duties owed asylees expose the same flaws in its contention that denaturalization is not a sufficiently automatic consequence of a guilty plea and conviction.

---

[12] *See id.* § 1158(b)(2)(A)(i), (iii)–(vi), (c)(2)(A)–(E).

[13] *See id.* § 1451(a); *Kungys,* 485 U.S. at 767; Gov't Br. at 19–20 ("[A]n inadvertent oversight or sincere failure of recollection in omitting the criminal conduct on a naturalization form would not have been a 'willful misrepresentation.'").

[14] In more detail: An individual's asylum-based status may be terminated if the noncitizen asylee, "having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States." 8 U.S.C. § 1158(b)(2)(A)(ii); *see also id.* § 1158(c)(2)(B) (identifying the conditions in § 1158(b)(2) as a basis for terminating asylum); *id.* § 1158(b)(2)(B)(i) (defining "particularly serious crime" to include an aggravated felony). Accordingly, in addition to establishing that the noncitizen has been convicted of a particularly serious crime, the government must also prove that the noncitizen "constitutes a danger to the community of the United States." *Id.* § 1158(b)(2)(A)(ii).

C.   The government's remaining arguments against applying *Padilla* to the risk of denaturalization and related deportation fail.

The government offers a host of other arguments in support of its position that *Padilla* should not apply to a client in Farhane's circumstances. None is convincing.

As an initial matter, we easily disavow any suggestion that *Padilla* protects only noncitizens. That the *Padilla* Court referred at points to "noncitizen defendants" and "noncitizen offenders," 559 U.S. at 364, 366, is unsurprising, since Padilla himself was a noncitizen. Notably, however, the Court in *Padilla* stated its holding in broad terms: "[W]e now hold that counsel must inform her *client* whether his plea carries a risk of deportation." *Id.* at 374 (emphasis added). And it stressed that "[i]t is our responsibility under the Constitution to ensure that no criminal defendant—*whether a citizen or not*—is left to the mercies of incompetent counsel." *Id.* (emphasis added) (internal quotation marks omitted). It seems to us perplexing and paradoxical, both, to construe *Padilla* as providing stronger protection to a *noncitizen* at risk of deportation (like Padilla) than to a *U.S. citizen* at risk of denaturalization followed by deportation (like Farhane).[15] Under the government's view, Farhane would have been better off had he never pursued naturalization: had he been merely a lawful permanent resident when he pleaded guilty, rather than a naturalized citizen, *Padilla* would settle that *Strickland* governed his ineffective assistance claim. *Cf. United States v. Winter*, 509 F.2d 975, 989 n.45 (5th Cir.

---

[15] Judge Walker's Dissent fails to address the apparent paradox that, under the government's and the prior panel majority's views, the Sixth Amendment would provide greater protection to a noncitizen faced with a risk of deportation than to a naturalized citizen also facing a risk of deportation. Indeed, it seems to us telling that it devotes much space to analyzing the deficient performance and prejudice prongs of *Strickland, see* Dissent (Walker, *J.*) at 9–21, rather than the merits of the Sixth Amendment claim. It does not face the puzzling situation its Sixth Amendment interpretation creates for criminal defense attorneys who would, under its view, be constitutionally required to advise only *some* of their immigrant clients about the immigration risks of a possible plea.

1975) ("We are unaware of any context . . . in which [a noncitizen] has greater rights under law in our Courts than an American citizen. Indeed, such a circumstance might in itself raise serious questions of equal protection.").

The government also maintains that the Sixth Amendment applies to affirmative misadvice regarding the risk of denaturalization but not to a wholesale failure to advise on that risk. But the Court roundly rejected an argument based on this very distinction in *Padilla* in terms equally apt here:

> A holding limited to affirmative misadvice would invite two absurd results. First, it would give counsel an incentive to remain silent on matters of great importance, even when answers are readily available. Silence under these circumstances would be fundamentally at odds with the critical obligation of counsel to advise the client of the advantages and disadvantages of a plea agreement. . . . Second, it would deny a class of clients least able to represent themselves the most rudimentary advice on deportation even when it is readily available.

559 U.S. at 370–71 (internal quotation marks omitted). We decline the government's invitation to adopt a rule that would lead to "absurd results," *id.* at 370, and that would incentivize counsel to remain silent when advice is most needed.

Nor do we agree with the government's suggestion that the rule we set forth today will call into question the applicability of the direct/collateral framework to ineffective assistance claims more broadly. As explained above, our conclusion here is dictated by *Padilla*'s holding that "advice regarding deportation is not categorically removed from the ambit of the Sixth Amendment right to counsel," even when "the deportation consequences of a particular plea are unclear or uncertain." *Id.* at 366, 369. The government recites a litany of other collateral consequences that it claims will by

virtue of our decision now fall in the Sixth Amendment's scope.[16] Virtually none of them, however, "carries a risk of deportation," the risk that the *Padilla* court held to be "unique." *Id.* at 365, 374. The government's argument therefore misses the mark.[17]

Next, like the Court in *Padilla*, we see no reason to expect that our decision today will open the floodgates to meritless challenges to long-final convictions. *See id.* at 371–72 (describing the "serious consideration" given to the concerns expressed "regarding the importance of protecting the finality of convictions obtained through guilty pleas" and nonetheless finding it "unlikely that our decision today will have a significant effect on those convictions already obtained as the result of plea bargains"). Any floodgates concerns here do not rest on solid ground. To start, the government has represented

---

[16] *See* Gov't Br. at 32 (listing as examples of other collateral consequences that would be called into question by virtue of a decision in Farhane's favor: "civil or criminal forfeiture, mandatory restitution, court martial or disqualification from the armed services, loss of . . . licenses granted by the state, loss of civil rights, loss of federal benefits, denial of certain types of employment, mandatory HIV testing, registration of sex offenders, use of the conviction in a subsequent civil or criminal case, and, for non-citizens, immigration consequences . . ." (internal quotation marks omitted)).

[17] With respect to the potential application of *Padilla*'s underlying reasoning to these other consequences, we stress the *Padilla* Court's characterization of deportation as "particularly severe," *id.* at 365, and the role that severity played in our analysis of denaturalization. Take civil forfeiture, one of the government's proffered examples. Although we do not decide this question today, it seems to us unlikely that civil forfeiture would come close to denaturalization and deportation in severity as well as irreversibility. As the Supreme Court has recognized, "denaturalization, like deportation, may result in the loss of all that makes life worth living." *Knauer v. United States*, 328 U.S. 654, 659 (1946) (internal quotation marks omitted); *see also Klapprott*, 335 U.S. at 612 (characterizing the loss of citizenship as "an extraordinarily severe penalty," one that cannot compare to "a mere money fine or a short imprisonment"); *Delgadillo v. Carmichael*, 332 U.S. 388, 391 (1947) (describing deportation as "the equivalent of banishment or exile"); *Schneiderman v. United States*, 320 U.S. 118, 122 (1943) (describing the benefits that derive from citizenship as "priceless," and characterizing the loss of citizenship as "more serious than a taking of one's property, or the imposition of a fine or other penalty"). The government has presented no instance in which civil forfeiture of assets meaningfully compares in permanence or familial consequences.

that it rarely seeks denaturalization, even following criminal convictions. *See* Gov't Br. at 18 (reporting that, based on its own review of dockets, just 228 denaturalization cases were filed nationwide between 2008 and 2020). In any event, the record offers no basis for estimating how many naturalized citizen defendants would even be eligible for denaturalization and deportation as a result of their guilty pleas. In addition, statutes of limitations and other constraints applicable to petitions for state and federal habeas and coram nobis relief can further be expected to reduce the likelihood that a flood will follow in this decision's wake. *See, e.g.*, 28 U.S.C. § 2255(f) (setting forth one-year statute of limitations, which runs from the latest of four dates, for § 2255 motions); *Jobe v. Comm'r of Corr.*, 224 A.3d 147, 159 (Conn. 2020) (concluding that "a petitioner whose conviction has expired fully prior to the filing of a habeas petition is not in 'custody' on that conviction within the meaning of [Connecticut's habeas statute]" (internal quotation marks omitted)); *State v. Grisgraber*, 439 A.2d 377, 379 (Conn. 1981) (stating that, in Connecticut, a writ of coram nobis "authorize[s] the trial judge, within three years, to vacate the judgment"); *People v. Friedgood*, 448 N.E.2d 1317, 1319 (N.Y. 1983) (finding no abuse of discretion in the trial court's denial of the defendant's motion to vacate his conviction under N.Y. Crim. Proc. Law § 440.10 where the defendant "waited for over three years to bring" his challenge). *But see In re D.C.*, 149 A.3d 466, 470 n.2 (Vt. 2016) (explaining that petitions for post-conviction relief "are not subject to a statute of limitations"); *Thompson v. Comm'r of Corr.*, 158 A.3d 814, 823 (Conn. App. 2017) (clarifying that there is no statute of limitations for a writ of habeas corpus in Connecticut). And the constitutional ruling on the Sixth Amendment's applicability to an ineffective assistance claim is only the threshold inquiry. It leads to a demanding analysis under *Strickland*, one that—the Court observed—rarely leads to overturning a conviction. *See Padilla*, 559 U.S. at 371–72 ("Surmounting *Strickland*'s high bar is never an easy task.").

Finally, the government's focus on the collateral estoppel effect of Farhane's plea and conviction is a red herring. *See, e.g.*, Gov't Br. at 17 ("The possibility of collateral estoppel in a civil denaturalization proceeding is a collateral consequence of a criminal conviction[.]"); *id.* at 28 (asserting that, even if Farhane's "criminal conviction would work to his detriment by virtue of collateral estoppel, . . . this Court has repeatedly held that collateral estoppel alone does not transform a collateral consequence into a direct one" (internal quotation marks omitted)). In reaching our conclusion today, we follow the *Padilla* Court's guidance by focusing instead on how Farhane's guilty plea carried the risk of adverse immigration consequences, specifically denaturalization and deportation. As we have already observed, the *Padilla* Court instructed that counsel must advise a client "that pending criminal charges may carry a risk of adverse immigration consequences." 559 U.S. at 369. Whether a conviction carries such a risk by virtue of collateral estoppel consequences or by serving as a predicate for the later immigration result is beside the point. Here, the government's denaturalization complaint expressly relied on Farhane's guilty plea, asserting that he "is collaterally estopped from contesting those matters determined by the judgment in the criminal case," and reminding the court that it was not free to take any related circumstances into account before entering a denaturalization order. App'x at 314. By making it substantially easier for the government to obtain Farhane's denaturalization, his guilty plea materially increased his risk of denaturalization and eventual deportation. Under *Padilla*, that is enough to trigger counsel's Sixth Amendment obligation to say *something* about the risk.

D.    The government forfeited its *Teague* argument.

The government also now contends that *Teague v. Lane*, 489 U.S. 288 (1989), precludes us from addressing Farhane's Sixth Amendment arguments. But the government forfeited their argument. As the original panel Majority observed, the

government "did not make this argument in the district court" and still has "offered no justification for the omission." *Farhane*, 77 F.4th at 126 n.4.

What is more, the government failed to raise *Teague* at the first opportunity it had in *this* Court, in its opposition to Farhane's request for a certificate of appealability. It was not until the appeal merits briefing stage—after a three-judge panel had already heard argument on Farhane's motion for a certificate of appealability and granted it— that the government mentioned *Teague* for the first time. The government has therefore forfeited its *Teague* argument, and we are under no obligation to consider it. *See, e.g.*, *Collins v. Youngblood*, 497 U.S. 37, 41 (1990) (instructing that *Teague* "is not 'jurisdictional' in the sense that [courts] . . . *must* raise and decide the issue *sua sponte*" (emphasis in original)); *Young v. Conway*, 698 F.3d 69, 86 (2d Cir. 2012) (noting that courts "have the discretion, but are by no means required, to address [*Teague*] defenses for the first time on appeal").

Although it is true that we may nonetheless exercise our discretion to consider the application of *Teague* to our holding today, the government does not offer any compelling reason why we should do so. In fact, the government's still-unexplained delay in raising the issue weighs heavily against the notion. If we were to consider and find persuasive the government's "eleventh-hour *Teague* argument" now, Farhane's Sixth Amendment contentions—the issues that the panel that granted Farhane a certificate of appealability, the panel that originally decided his appeal, and a majority of the en banc Court all "thought worthy of review"—"would be insulated from our consideration." *Buck v. Davis*, 580 U.S. 100, 127–28 (2017). We therefore decline to consider the government's forfeited *Teague* argument.

*       *       *

In sum, we conclude that criminal defense counsel has a Sixth Amendment obligation to inform a client that his plea carries a risk of serious adverse immigration consequences: here, of denaturalization and related deportation. *Padilla* dictates this result.

II.    **We remand Farhane's case to permit the District Court to conduct a *Strickland* analysis in accordance with the Sixth Amendment understandings we reach.**

Having established that the Sixth Amendment requires counsel to advise naturalized citizen clients of the risk of denaturalization and deportation arising from a guilty plea, the next step is consideration of the merits of Farhane's claim that his counsel's failure to do so in 2006 constituted ineffective assistance. To establish that his counsel was constitutionally ineffective, Farhane must show that (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "any deficiencies in counsel's performance [were] prejudicial to the defense." *Strickland*, 466 U.S. at 688, 692.

A.    The District Court should reevaluate whether Farhane's counsel's performance was objectively unreasonable under professional norms prevailing in 2006.

Under *Strickland*'s first prong, the defendant must show that his lawyer's performance "falls outside the 'wide range of professionally competent assistance.'" *Kovacs v. United States*, 744 F.3d 44, 50 (2d Cir. 2014) (quoting *Strickland*, 466 U.S. at 690). To assess objective reasonableness, we evaluate "prevailing professional norms" at the time of representation, using "American Bar Association ["ABA"] standards and the like [as] guides to determining what is reasonable." *Padilla*, 559 U.S. at 366 (internal quotation marks and alterations omitted).

Here, in concluding that Farhane failed to establish that his counsel's performance was objectively unreasonable, the District Court's reasoning cannot be

squared with *Padilla*. In its analysis, the District Court relied principally on the fact that, because Farhane "was a U.S. citizen at the time of his plea," his conviction did not create an "imminent risk of deportation." *Farhane*, 2020 WL 1527768, at *2. But by requiring Farhane to show that his conviction gave rise to an *imminent* risk of deportation, the District Court impermissibly narrowed *Padilla*. As explained above, the Supreme Court held in *Padilla* that counsel must inform her client "whether his plea carries a *risk* of deportation." 559 U.S. at 374 (emphasis added). It stressed that counsel's duty to advise her client about the risk of deportation applies whenever that risk exists, not solely when that risk is imminent or crystal clear. *See id.* at 369 & n.10 (explaining that lack of clarity in the law affects only the scope and nature of the advice counsel has a duty to provide, not whether counsel has such a duty at all). The District Court, in focusing only on an "imminent risk of deportation," *Farhane*, 2020 WL 1527768, at *2, therefore assessed the objective reasonableness of counsel's performance in the first instance using an incorrect understanding of *Padilla*.

Accordingly, we remand for the District Court to reevaluate whether Farhane's counsel's failure to advise was objectively reasonable. The correct question—and the one that the District Court should answer on remand—is whether prevailing professional norms in 2006, when Farhane pleaded guilty, required defense counsel to advise naturalized citizen clients of the risk of denaturalization and deportation stemming from entry of a guilty plea.[18] In determining what was reasonable in 2006, it

_____

[18] We note that the defendant whose guilty plea was at issue in *Padilla* was counseled and entered his guilty plea in 2002—four years before Farhane pleaded guilty. *See Padilla v. Commonwealth*, 381 S.W.3d 322, 324 (Ky. Ct. App. 2012). The Supreme Court in *Padilla* reviewed "authorities of every stripe" before concluding that "[t]he weight of prevailing professional norms supports the view that counsel must advise her client regarding the risk of deportation." 559 U.S. at 367 (internal quotation marks and alterations omitted). It emphasized that professional norms had imposed such a duty on defense counsel "[f]or at least the past 15 years"—that is, since at least 1995. *Id.* at 372.

should consult ABA standards and similar materials, which "may be valuable measures of the prevailing professional norms of effective representation"—but "are only guides, . . . and not inexorable commands." *Padilla*, 559 U.S. at 366–67 (internal quotation marks omitted).

Farhane's trial counsel should also have an opportunity to be heard. The District Court denied Farhane's § 2255 petition without an evidentiary hearing, and so counsel had no opportunity either to describe or to explain his conduct: we have Farhane's account, through his affidavit, but not counsel's. Our "usual practice" is "to remand *Strickland* cases to the district court to permit the attorney in question to testify and explain h[is] actions." *Jackson v. Leonardo*, 162 F.3d 81, 86 (2d Cir. 1998); *see also Sparman v. Edwards*, 154 F.3d 51, 52 (2d Cir. 1998) ("[A] district court facing the question of constitutional ineffectiveness of counsel should, except in highly unusual circumstances, offer the assertedly ineffective attorney an opportunity to be heard and to present evidence, in the form of live testimony, affidavits, or briefs."). We see no reason to depart from that practice here. And Farhane may be heard in person, too, instead of solely by affidavit.

To clarify: on remand, the District Court should determine whether Farhane's counsel's performance *in 2006* was objectively unreasonable by analyzing relevant authorities on professional norms and providing Farhane's trial counsel with an opportunity to speak.

B.   The District Court should address in the first instance whether Farhane established prejudice.

Under *Strickland*'s second prong—prejudice—the defendant must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Padilla*, 559 U.S. at 366 (quoting *Strickland*, 466 U.S. at 694). In the plea context, "we do not ask whether, had he gone to trial, the result

of the trial would have been different than the result of the plea bargain." *Lee*, 582 U.S. at 364 (internal quotation marks omitted). Instead, we consider whether the defendant has demonstrated a "reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* at 364–65 (quoting *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)); *see also Kovacs*, 744 F.3d at 52 (concluding that prejudice also exists if the defendant can show that "there was a reasonable probability that [he] could have negotiated a plea that did not impact [his] immigration status").

We decline to determine the prejudice question as to Farhane now.[19] The Supreme Court has emphasized that determining "what an individual defendant would have done" as part of the prejudice inquiry "demands a case-by-case examination of the totality of the evidence." *Lee*, 582 U.S. at 367–68 (internal quotation marks omitted). In the District Court, Farhane did not have a robust opportunity to develop a relevant record nor did the government have a chance to rebut it. On remand, both will have that opportunity, and further, the District Court will be positioned to assess the credibility of Farhane's assertion that, had he been properly advised, he would have insisted on proceeding to trial.[20] *See, e.g.*, *Padilla*, 559 U.S. at 369 ("Whether Padilla is entitled to relief on his claim will depend on whether he can satisfy *Strickland*'s second

---

[19] The District Court should consider, among other things, whether Farhane might have "placed particular emphasis on immigration consequences in deciding whether or not to plead guilty," *Doe v. United States*, 915 F.3d 905, 911 (2d Cir. 2019) (quoting *Kovacs*, 744 F.3d at 52) (alterations adopted)—enough to forgo the ten-year reduction in his maximum possible sentence that resulted from his entry of a guilty plea.

[20] Farhane additionally argues that he could have presented viable defenses at trial, and that his trial counsel could have "leveraged" these defenses "to negotiate an alternative plea deal that foreclosed the risk of denaturalization and deportation." Farhane Br. at 51; *see also id.* at 46–49 (contending that he could have challenged the credibility of the government's "key witness" at trial); *id.* at 49–51 (asserting that he could have mounted an entrapment defense). Unsurprisingly, the government disputes these contentions. We express no view on these issues here; on remand, the District Court may consider these arguments as it sees fit.

prong, prejudice, a matter we leave to the Kentucky courts to consider in the first instance."); *Rodriguez v. United States*, 730 F. App'x 39, 44 (2d Cir. 2018) (finding it "not clear on this record whether Rodriguez would have proceeded to trial had she known she could face denaturalization" and remanding "for the district court to develop a fuller record concerning the issue of prejudice").

*     *     *

For the reasons stated above, we remand to the District Court to permit it to make fresh determinations on both prongs of the *Strickland* inquiry after allowing the parties to develop the relevant records and conducting an evidentiary hearing as appropriate.[21]

## CONCLUSION

For the foregoing reasons, we **VACATE** the decision of the prior panel Majority; **VACATE** the judgment of the District Court; and **REMAND** the case for further proceedings consistent with this opinion.

---

[21] Of course, "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.