O5M5farA

1    UNITED STATES COURT OF APPEALS
     FOR THE SECOND CIRCUIT
2    ------------------------------x

3    ABDERRAHMANE FARHANE,

4                   Petitioner-Appellant,

5          v.                              20-1666

6    UNITED STATES OF AMERICA,

7                   Respondent-Appellee,

8    ------------------------------x
                                        New York, N.Y.
9    Before:                            May 22, 2024

10
                      HON. JOHN M. WALKER, JR.,
11                     HON. RICHARD C. WESLEY,
                        HON. SUSAN L. CARNEY,
12                    HON. RICHARD J. SULLIVAN,
                       HON. MICHAEL H. PARK,
13                    HON. WILLIAM J. NARDINI,
                      HON. STEVEN J. MENSASHI,
14                     HON. EUNICE C. LEE,
                       HON. BETH ROBINSON,
15                      HON. MYRNA PÉREZ,
                      HON. ALISON J. NATHAN,
16                   HON. SARAH A. L. MERRIAM,
                      HON. MARIA ARAÚJO KAHN,

17

18                                        Circuit Judges

19                         APPEARANCES

20

21   DAMIAN WILLIAMS
          United States Attorney for the
22        Southern District of New York
     BY:   KARL N. METZNER
23        Assistant United States Attorney

24   MAIN STREET LEGAL SERVICES, INC.
     CITY UNIVERSITY OF NEW YORK SCHOOL OF LAW
25        Attorneys for Petitioner-Appellant
     BY:  RAMZI KASSEM

1    (Case called)

2    JUDGE SULLIVAN:  I am told all the lawyers are here

3    and so we have allotted 25 minutes per side.  If judges are

4    interested we may go a little over, but that is the plan.  I

5    understand, Mr. Kassem, that you have reserved five minutes for

6    rebuttal; is that right?  All right.  So, give us a chance to

7    get all of these notices out and we will proceed.

8    Everybody ready?  You may proceed.  Thanks.

9    MR. KASSEM:  Good afternoon, your Honor, and may it

10   please the Court:

11   A competent defense lawyer in 2006, representing a

12   client he knows to be a naturalized U.S. citizen who is facing

13   serious charges stemming from years-old conduct should, at a

14   constitutional minimum, alert his client to the possibility

15   that pleading guilty to pre-naturalization conduct could lead

16   to deportation.

17   Because Abderrahmane Farhane's defense lawyer never

18   warned him about the deportation risk, a straightforward

19   application of *Padilla* and *Strickland* should bring this Court

20   to vacate Mr. Farhane's guilty plea and conviction.  The Court

21   could also follow *Padilla*'s reasoning to find that the

22   distinction between collateral and direct consequences is as

23   ill-suited to denaturalization as it is to deportation.

24   A ruling in Mr. Farhane's favor here would impose only

25   a minimal burden on defense lawyers because it is not very

1    different from what they already do.  And, because there are

2    fewer denaturalization cases than deportation cases, the rule

3    would only be relevant to a comparatively small number of

4    cases.

5            At the same time, the impact of denaturalization and

6    deportation on clients and their families could not be more

7    severe.  In other words, the cost is low and the benefit high

8    to defendants and to the integrity of proceedings.  By

9    contrast, the implication of the District Court's ruling below

10   and of the government's position here would be absurd.

11           There is no dispute that had Mr. Farhane been a lawful

12   permanent resident instead of naturalized U.S. citizen at the

13   time he pled guilty in 2006, then his defense lawyer's failure

14   to advise him of the deportation risk would have been deficient

15   under the Sixth Amendment.  The government has already conceded

16   as much.  Mr. Farhane, essentially, would be penalized for

17   going through the arduous --

18           JUDGE SULLIVAN:  They are different risks, right?

19           MR. KASSEM:  Your Honor, they are different risks, but

20   they are both particularly severe immigration consequences and

21   they are the only two severe immigration consequences that have

22   been likened by the Supreme Court --

23           JUDGE WALKER:  There are many collateral consequences

24   and many severe consequences.

25           MR. KASSEM:  That is correct, your Honor.

1          JUDGE WALKER:  Sex offender registration, being

2     stripped of all of your assets, forfeiture.  All of those

3     things.

4          MR. KASSEM:  Of course, your Honor.  All of those

5     other collateral consequences that you have named, the law is

6     well settled.  With respect to denaturalization and

7     deportation, those are the only two that the Supreme Court has

8     mentioned in a single breath as being the equivalent of

9     banishment, exile, the loss of life --

10          JUDGE WALKER:  They never reached a decision on

11     collateral versus direct as far as denaturalization is

12     concerned.  That is what we are doing here.

13          MR. KASSEM:  Your Honor, this Court could simply apply

14     *Padilla*.  Mr. Farhane was not warned about the deportation risk

15     at play in the plea that he was advised to take.

16          JUDGE WALKER:  So I have looked at all of the various

17     documents that you have supplied in terms of what the standards

18     were back in 2006.  Now, we are talking now about the current

19     situation in 2017, but back in those consequences and the

20     standards that existed that the time, and particularly with the

21     ABA, there is a long list of collateral consequences that they

22     think would be a good idea for the lawyers to advise their

23     clients on that are considered collateral.  They use the term

24     "collateral".  But, there is a very long list of consequences

25     and they go into it in great detail but nowhere is there a

1    reference to warning a U.S. citizen about the possibility of

2    denaturalization and the possibly leading to deportation.

3    There is all sorts of references to doing that with respect to

4    a person who is an immigrant who is standing in the country and

5    that is sort of the standard practice for the ABA to have those

6    standards but never for a citizen.  So I am wondering about two

7    things.  First of all, we know that this is a very rare

8    occurrence; and secondly, the standards really didn't apply to

9    this kind of situation.  And if the ABA couldn't come up with a

10   reason to give a warning to a potential person pleading guilty,

11   how could it be reasonable for his lawyer to do it?

12              MR. KASSEM:  Your Honor, if you will allow me two

13   points.

14              On the denaturalization point, the very treatise that

15   the Supreme Court cited in *Padilla*, the 2003 edition of Tooby,

16   mentioned denaturalization risk stemming from

17   post-naturalization pleas to pre-naturalization conduct and it

18   cites cases that mirror what is happening to Mr. Farhane today.

19   So denaturalization was not an unknown risk, that was a

20   resource that was mentioned in *Padilla*.  And New York State

21   Defenders' Association's --

22              JUDGE WALKER:  The fact that there could be

23   denaturalization obviously goes with any time that there is a

24   naturalization, but the fact that the lawyer is required to

25   warn them is not -- I couldn't find it any materials.

1        MR. KASSEM:  Well, your Honor --

2        JUDGE WALKER:  -- the brief.

3        MR. KASSEM:  Your Honor, the prevailing professional

4    norms are the expectations and practice of the legal community.

5    That is what the Supreme Court said in *Padilla*.

6        JUDGE WALKER:  Right.

7        MR. KASSEM:  So if Mr. Farhane's trial counsel --

8        THE COURT:  But those norms don't draw the parameters

9    of the Sixth Amendment.  *Padilla* is quite clear about that.

10   *Padilla* set out and tried to extrapolate and Justice Kagan's

11   opinion, after the fact, says what they were doing there was

12   they were trying to understand around what legal relationships

13   does the Sixth Amendment attach.  And in *Padilla* they said the

14   confluence of immigration and criminal law is so unusual that

15   characterizing something that is collateral indirect doesn't

16   work.

17       Isn't that the case?

18       MR. KASSEM:  Your Honor, correct.

19       THE COURT:  And she was quite clear to say this was

20   new ground, this was brand-new ground, and that the norms of

21   practice don't become relevant in understanding or evaluating

22   prejudice or performance until after one understands that there

23   is a constitutional premise of effective assistance of counsel

24   working within the relationship.  The relationship between the

25   lawyer and the individual being represented, the individual who

O5M5farA

 1  is charged with the crime and perhaps facing deportation, the

 2  person charged with the crime, and I presume you would say,

 3  facing denaturalization; correct?

 4         MR. KASSEM:  Your Honor, again, our position is that

 5  Mr. Farhane faced a risk of deportation about which he was not

 6  warned by his trial counsel, so under a straightforward

 7  application of *Padilla* --

 8         THE COURT:  *Padilla* established that relationship, not

 9  the ABA.

10         MR. KASSEM:  Well, your Honor, *Padilla*, in Section 2

11  of the opinion in *Padilla* --

12         THE COURT:  The fact that a really good lawyer might

13  think about that doesn't define the parameters of the Sixth

14  Amendment's protection, does it?

15         MR. KASSEM:  What the Supreme Court held in *Padilla*,

16  looking back to as early as 1995, the advice about the

17  deportation consequence was part of the prevailing professional

18  norms, at least going back to 1995.  The Court in *Chaidez*

19  actually dated it back to 1968.  What the Court did in *Padilla*

20  was that it decided, based on the severity of the particular

21  severity of deportation and the intimate relation that it bears

22  to the criminal justice system process --

23         JUDGE MENASHI:  (unintelligible) Right?  The Supreme

24  Court says it is nearly automatic and practically inevitable if

25  he is convicted that he is going to be deported.  Isn't it

1  different here?  So, in *Padilla* the conviction itself makes him

2  deportable.  Right?  Whereas here, the conviction is neither

3  necessary nor sufficient for the denaturalization proceeding.

4  Right?  Isn't it right that, you know, we could vacate

5  Mr. Farhane's conviction and the government could still pursue

6  the denaturalization by introducing all of the evidence that he

7  committed the crime and therefore had bad moral character or

8  misrepresented something willfully in the immigration

9  proceeding.  Or, the conviction could stand and you could still

10 argue against denaturalization on the ground that it wasn't

11 willful or knowing or that there was some extenuating

12 circumstances that may tend to have good moral character.

13 Right?  So it is not as automatic as the deportation

14 consequences in *Padilla*.

15      MR. KASSEM:  Well, Judge Menashi, the denaturalization

16 and deportation consequences at play here are automatic.  They

17 may be different from the exact mechanism that were at play in

18 *Padilla*.

19      JUDGE MENASHI:  Automatic?  Didn't it take the

20 government 12 years to bring the denaturalization proceeding

21 and they didn't bring it until after he was -- it seems like

22 they decided to do it much later on.

23      MR. KASSEM:  Your Honor, the passage of time is

24 irrelevant to the *Padilla* analysis.  There many pure

25 deportation cases where removal proceedings are not initiated

1    for an extensive period of time as well.  The important thing

2    here is that though the links in the chain may be lengthy or

3    more numerous, in this particular case.  *Padilla* actually

4    accounts for that.  *Padilla* says where the law is clear, as it

5    is in *Padilla*, clear advice is owed.  And where the law is less

6    clear is where there is some attenuation, there is more

7    complexity to the legal risk analysis, then counsel must still

8    say something.  And here, Mr. Farhane, who is owed advice about

9    both denaturalization and deportation, importantly, was told

10   nothing.

11        JUDGE MENASHI:  You are saying that *Padilla* says where

12   there is an attenuated risk, counsel is supposed to say

13   something?

14        MR. KASSEM:  Exactly, your Honor.

15        JUDGE MENASHI:  The Supreme Court, in *Padilla*, says

16   they're creating an exception to the normal collateral

17   distinction because of the nearly automatic consequence.

18        MR. KASSEM:  But your Honor, the Supreme Court in

19   *Padilla* accounted for a range of complexity and legal analyses,

20   and so when it comes to immigration, because immigration law is

21   complicated, sometimes the causal chain may be long or more

22   complex, more obscure, and in those circumstances trial counsel

23   must still say something.  Lack of clarity in the law, the

24   Supreme Court said in *Padilla* does not obviate --

25        JUDGE NATHAN:  And not just lack of clarity.  Doesn't

1    *Padilla* say unclear and uncertain?

2              MR. KASSEM:  That's correct, your Honor.

3              JUDGE NATHAN:  Can it be uncertain and automatic at

4    the same time?

5              MR. KASSEM:  Absolutely, your Honor.

6              You can take the example of Mr. Farhane's case.  His

7    lawyer advised him to plead guilty to a pre-naturalization

8    aggravated felony.  Now that aggravated felony automatically

9    disqualifies him from naturalization, subjects him to

10   denaturalization, and the same aggravated felony, once he is

11   denaturalized, will make him automatically deportable.  So when

12   you look at the lead count in the denaturalization complaint in

13   the Eastern District, the illegal procurement count, that count

14   is made out automatically by the aggravated felony that went

15   unwarned.

16             JUDGE WALKER:  But that is not a function of whether

17   there is a conviction, right?  It is a function of -- the facts

18   in question go back to the earlier period, 2002, 2001, and

19   those facts exist today, they existed then.  That is what

20   triggered the initial civil denaturalization proceeding and

21   that it was filed.  Now the criminal case comes along and then

22   all you get is all the government's advantage there is they get

23   a collateral estoppel on the facts that he admitted to, it is

24   just an evidentiary point that is made.  It could be proven all

25   sorts of different ways, civil denaturalization, with or

1    without a criminal conviction, right?

2           MR. KASSEM:  No, your Honor.  This is not a case about

3    collateral estoppel, it is about the legal effect of the

4    conviction and whether a person of Mr. Farhane's position --

5           JUDGE WALKER:  The legal effect of the conviction

6    beyond collateral estoppel.  It is just basically telling

7    Farhane that he has no -- he can't gain say what the government

8    is saying he did back in 2001 and 2002.

9           MR. KASSEM:  Your Honor, let me try to get at the

10   question a different way.  Collateral estoppel is also a play

11   on removal proceedings around removal can also be established

12   based on conduct and not a conviction.  So the fact that you

13   can establish denaturalization or deportation based on conduct

14   or a conviction doesn't resolve the issue here.

15          THE COURT:  Isn't it correct that there was no civil

16   denaturalization proceeding that was instituted as a result of

17   the conduct, although the government was fully aware of the

18   conduct because there was a confidential informant involved?

19          MR. KASSEM:  Absolutely, your Honor.

20          THE COURT:  It was only after the criminal proceedings

21   on the false statements and the conspiracy count, and after he

22   had served his term a year after finishing his term of 10-plus

23   years, 13 years, that is when the civil denaturalization began.

24          MR. KASSEM:  Absolutely, your Honor.  It was only

25   after Mr. Farhane had served 11 out of 13 years and been

1   release on good conduct.  A year after his release was when the

2   denaturalization proceedings were initiated.

3        JUDGE WALKER:  If in fact your side prevails on this

4   particular point, leaving aside the ineffective assistance of

5   counsel, stricken calculus, that the government's proceeding of

6   denaturalization, they just couldn't use the contents of the --

7   they couldn't use the contents of the guilty plea.

8        MR. KASSEM:  Your Honor, the fact that the government

9   may proceed with an entirely different civil denaturalization

10  case is neither here nor there for purposes.

11       JUDGE WALKER:  It is not a different case, it is the

12  same case you are starting with.

13       MR. KASSEM:  Well, your Honor, but it is neither here

14  nor there for the purpose of the *Padilla* analysis.  The *Padilla*

15  analysis is about the advice that is owed when there is a risk

16  of a particularly severe immigration consequence at play.

17       JUDGE SULLIVAN:  Here you are an automatic.  Those are

18  the two that are discussed.

19       MR. KASSEM:  That is correct, your Honor.  And on the

20  automatic point, again, here one need only to look to the

21  nature of the conviction, it is an aggravated felony conviction

22  that predates Mr. Farhane's naturalization.

23       JUDGE SULLIVAN:  You are saying it is automatic after

24  he has been denaturalized.  The point is denaturalization is

25  not automatic.

1            MR. KASSEM:  Well, your Honor, neither is deportation.

2     So the *Padilla* analysis --

3            JUDGE SULLIVAN:  But the point is that the immigration

4     laws require that certain convictions mean automatic

5     deportation; right?

6            MR. KASSEM:  Right, your Honor, but --

7            JUDGE SULLIVAN:  There may be discretion and there may

8     be slip-ups but the point is that statutorily it is required,

9     that it is the result of the conviction.

10           MR. KASSEM:  Your Honor --

11           THE COURT:  Could I ask you to clarify that?  Is it

12    deportable that you become, or you become deported, you

13    automatically get served a notice to appear?  Just to clarify.

14           MR. KASSEM:  You become deportable, your Honor.  And

15    as this Court well knows from reviewing numerous immigration

16    cases that linger on the dockets endlessly, the initiation of

17    removal proceedings or denaturalization proceedings is not

18    immediate, that is an act of executive discretion and that may

19    happen immediately or it may happen 10 years into the future.

20    Once it happens is where the *Padilla* analysis kicks in, that is

21    where the word "automatic" gains its meaning.  In other words,

22    when *Padilla* speaks of an automatic consequence, it is not

23    speaking about the initiation of removal or denaturalization

24    proceedings.  It is talking about what happens legally, what is

25    the legal risk once those proceedings are initiated.  And you

1    can take the conviction at issue in *Padilla* itself, that was a

2    2001 conviction.  Mr. Padilla was not in removal proceedings

3    for that conviction.

4           JUDGE MENASHI:  You are saying even if

5    denaturalization were more extraordinarily rare, which I guess

6    it is but assume it is even more extraordinarily rare, let's

7    say there is one denaturalization every 100 years, we shouldn't

8    think about what they say in *Padilla* about how it is automatic

9    and how our practice is that many people are just automatically

10   deported after committing a crime.  You should only think about

11   the automatic nature of it once that proceeding is brought?  I

12   thought it was unheard of that people were denaturalized.

13          MR. KASSEM:  That's correct, your Honor.  Well,

14   denaturalization was not unheard of and we can talk about --

15          JUDGE MENASHI:  It sounds like your argument is, even

16   if it is unheard of, even if it almost never happens --

17          MR. KASSEM:  Sure.

18          JUDGE MENASHI:  -- *Padilla* still covers it because the

19   language about automatic only applies once the government

20   decides to bring it.

21          MR. KASSEM:  Your Honor, the *Padilla* analysis does not

22   turn on trial counsel's assessment of the odds of a

23   particularly severe immigration consequence whether it is some

24   form of deportation or denaturalization, and it doesn't turn on

25   even the Court's assessment of the probability of that

1  particularly severe immigration consequence.  It really turns

2  on whether the legal risk is present.  *Padilla* repeatedly talks

3  about a risk of deportation and how advice is owed.  Now again,

4  where the law is clear as it was in *Padilla*, where the legal

5  consequence is clear and the causal chain is relatively short,

6  then clear advice is owed.

7  THE COURT:  *Padilla* says carries the risk, carries the

8  risk of deportation.  It doesn't say it carries the risk of an

9  automatic deportation.

10  MR. KASSEM:  That's correct, your Honor.

11  THE COURT:  That it is imminent, right?

12  MR. KASSEM:  That's correct, your Honor.

13  THE COURT:  The Court relies on lack of imminence.

14  JUDGE PEREZ:  I would say that given the amount of

15  discretion and the delay, how helpful is the term "automatic"

16  in any of this as a practical matter?  I mean, we are not

17  talking about mathematical certainties in any context; is that

18  correct?

19  MR. KASSEM:  That's absolutely correct, Judge Perez.

20  And again, that is the point I was trying to make earlier about

21  the meaning of the term automatic.  It does not mean imminent.

22  It does not mean immediate.  Clearly in the *Padilla* analysis it

23  is about the risk assessment.  It is not about practical risk,

24  it is about legal risk.  So once removal proceedings are

25  initiated, once denaturalization proceedings are initiated, how

1   automatic is the particularly severe immigration consequence?

2   And I just want to be clear on one point, it doesn't require

3   everyone to lose, it just means the mine-run of cases will

4   result in deportation or denaturalization.

5          THE COURT:  Why would the mine-run of cases involving

6   denaturalization automatically end in denaturalization?

7   Because I thought you had to prove, if you are the government,

8   not just that the crime was committed, but that it was

9   willfully concealed or misrepresented.  I mean, isn't this a

10  lot like, I don't know if you are familiar with *Rehaif*, who is

11  the felon in possession statute where now not only does the

12  government need to prove that you were felon in possession of a

13  gun but that you knew you were a felon.  So you have an

14  additional mental state.  So you have to prove, if you are the

15  government, not just that a crime was committed, but that you

16  knew what you did was a crime, which in criminal mens rea terms

17  usually would refer to willfulness which is generally not an

18  element of crime and I believe is not an element of crime to

19  which your client pled guilty.

20         MR. KASSEM:  Your Honor --

21         THE COURT:  It is a big hurdle and we reverse plenty

22  of criminal cases where the government has not made that

23  showing.

24         MR. KASSEM:  Your Honor, in this case one need only

25  take a look at the denaturalization complaint that the

1  government filed in the Eastern District of New York and the

2  supporting affidavit by a special agent, the affidavit of good

3  cause.  That denaturalization complaint repeatedly references

4  the conviction, the guilty plea, so does the affidavit, and

5  that is with respect to all three denaturalization counts.

6      JUDGE WALKER:  But it wasn't necessary to do that to

7  get denaturalized, was it?  I mean you can bring a

8  denaturalization proceeding independent of a criminal

9  proceeding.

10     MR. KASSEM:  Your Honor, you are correct, but you can

11  also bring a removal proceeding based on conduct and if, for

12  example, in a criminal proceeding a client is not advised about

13  pleading to conduct -- not a conviction, conduct -- that makes

14  them removable, then that conviction, that plea, itself, can be

15  vacated subject under *Padilla*.  And we cited cases to that

16  effect.  There are cases we haven't cited like *People v.*

17  *Saunders* here in New York in 2021 where, again, it is a

18  conduct-based ground of removal that was admitted as part of a

19  plea process that was vacated because the plea was unadvised as

20  to the removal consequence of the conduct.

21     JUDGE WALKER:  Just going back to civil

22  denaturalization, you could bring civil denaturalization based

23  upon poor moral character, if it had nothing to do with a

24  conviction.  It wouldn't have to be a conviction at all.  You

25  would just go back and put on the recordings and that is poor

1    moral character, and then he can try and defend himself if he

2    wants to on that but I am seeing two different proceedings that

3    are really unrelated to one another except for the fact that

4    they converge only at the point of his conviction in the sense

5    of now it might be used in civil denaturalization case.  But

6    civil denaturalization is, can be achieved without the

7    conviction, a conviction is not necessary for it, and, yes, the

8    government could rely on it in the sense of it gets, in effect,

9    a collateral estoppel effect.

10        MR. KASSEM:  Your Honor, I guess the short answer is,

11   you know, if you are facing denaturalization or deportation

12   based on conduct without a conviction, then you wouldn't have

13   an ineffective assistance of counsel claim in relation to the

14   criminal justice process.  I mean this is -- we are here today

15   because Mr. Farhane was not advised about the deportation

16   consequence.

17        THE COURT:  Could Mr. Farhane, presuming Mr. Farhane

18   loses his citizenship premised on lying on his naturalization

19   application, is that one of the things that are alleged to have

20   occurred here?  And he is not -- the application to take his

21   citizenship away is not premised on his conviction; correct?

22   It is not -- you are losing your citizenship because of your

23   conviction?

24        MR. KASSEM:  Your Honor, the affidavit in support of

25   the first count cites the conspiracy to commit the crime of

1  money laundering.  That is the actual crime of conviction.  The

2  legal procurement, the lead count, and if you look --

3          JUDGE MENASHI:  (unintelligible) Lack of good moral

4  character, right, and that includes whether you committed the

5  crime.  But even if he is convicted, he could also argue there

6  were extenuating circumstances.

7          MR. KASSEM:  Well, your Honor, we aren't aware of any

8  defenses to the --

9          THE COURT:  One Second.  Let me ask you this.

10          MR. KASSEM:  Sure.

11          THE COURT:  In the statute that defines what the

12  qualifications or conditions are to de naturalize someone, is a

13  conviction of this crime mentioned?

14          MR. KASSEM:  Your Honor --

15          THE COURT:  -- it is not.

16          MR. KASSEM:  No, the -- actually, no --

17          THE COURT:  Let me finish.  Let me finish.

18          MR. KASSEM:  Your Honor, if I can --

19          THE COURT:  If you assume that he is denaturalized, it

20  is not because of his conviction, is it?

21          MR. KASSEM:  Your Honor, it is because of the

22  conviction.

23          THE COURT:  Presume that he is denaturalized but he is

24  still convicted, what happens to him?

25          MR. KASSEM:  Your Honor, if he is denaturalized and

1  conviction stands, then he is automatically deportable because

2  it is an aggravated felony that was committed

3  pre-naturalization.

4  　　　　THE COURT:  So it speaks to his deportability because

5  under the immigration law, a conviction for a crime of moral

6  turpitude or aggravated felony of which this constitutes an

7  aggravated felony, becomes the grounds about which he is

8  deportable; is that correct?

9  　　　　MR. KASSEM:  Your Honor, this conviction for an

10  aggravated felony automatically disqualifies him for

11  naturalization.  That is by operation of law so it subjects him

12  to denaturalization again by operation of law and it is the

13  same conviction that makes him deportable.  So our point is

14  since there is a deportation consequence however remote, he was

15  owed advice about it.

16  　　　　THE COURT:  My only suggestion to you is that this

17  doesn't seem to me to be *Padilla* but it does seem to me to be

18  *Padilla*-plus in the sense that his conviction does bear some

19  relationship to his immigration status, once his immigration

20  status becomes relevant.

21  　　　　MR. KASSEM:  Your Honor, so it is *Padilla*, again to

22  the extent that *Padilla* anticipates scenarios like this where

23  the law is not succinct, not as straightforward as it was in

24  *Padilla* where the causal chain may be lengthier.

25  　　　　THE COURT:  What I am suggesting is doesn't this seem

1    like it is an extension of *Padilla* then?  Giving him relief

2    requires us to take *Padilla* a step further than *Padilla* because

3    *Padilla* simply talks about -- *Padilla* is talking about what the

4    Sixth Amendment protections are for a person who is has an

5    immigration status who is charged with a crime.  This is a

6    naturalized citizen who is charged with a crime.  What are the

7    Sixth Amendment protections and what are the obligations of

8    counsel with regard to making sure that there is Sixth

9    Amendment protections of the Sixth Amendment.

10          MR. KASSEM:  Well, your Honor, our view is that what

11    counsel did here -- counsel -- I mean, it is undisputed that

12    counsel knew that he was representing a naturalized citizen

13    facing very serious charges stemming from years-old conduct.

14    And so, it is not a leap to infer that counsel knew that the

15    conduct predated Mr. Farhane's naturalization.

16          THE COURT:  It was decided in 2010, only two states in

17    the entire country -- New York being one of them I might add --

18    only two states in the country imposed effective assistance of

19    counsel obligation upon an attorney representing someone in a

20    criminal proceeding to appreciate the immigration ramifications

21    of a conviction.  No circuit in the country recognized such

22    obligation.  The fact that there may be good lawyers doesn't

23    mean they're bad lawyers or unconstitution -- bad lawyers in

24    the sense of lawyers not as good or as well-armed with regard

25    to their responsibilities.  Our (unintelligible)

O5M5farA

1          MR. KASSEM:  Your Honor, we can only apply *Padilla*,

2     and what *Padilla* did was it acknowledged your point, your

3     Honor, but then it looked to prevailing professional norms as

4     reflected by the practice and expectations of the legal

5     community and it noted that at least as early as 1995, lawyers

6     were being instructed to advise on deportation consequences.

7     The Supreme Court, in *Chaidez*, brought that back to --

8          JUDGE WALKER:  One of the norms that you cited prior

9     to that, 2005, dealt with non-citizens; right?  And in the

10    context of non-citizens, immigration consequences that might

11    flow from that --

12         MR. KASSEM:  Your Honor, again --

13         JUDGE WALKER:  -- as aspirational points that you --

14         MR. KASSEM:  Again, your Honor, treatise that Supreme

15    Court sited in *Padilla*, the Tooby 2003 edition specifically

16    talks about denaturalization risk.  The New York State

17    Defenders Association Deportation 101 resource which, by the

18    way, is not just a resource, it is a reflection of the

19    curriculum on which defense lawyers were trained at the time,

20    that warned about denaturalization risks.  And had

21    Mr. Farhane's trial counsel just picked up the phone and called

22    the Immigrant Defense Project hotline what they would have said

23    to him is beware of the denaturalization and deportation risk

24    in this sort of case because you are advising your client to

25    plead guilty to conduct alleged to have occurred when he was

1     still a non-citizen.

2            JUDGE WALKER:  How do you explain the fact that in

3     1999 the ABA came up with standards that you cite and that you

4     rely on pretty heavily, about what to do with all of these

5     various consequences, and not once in there is there any

6     reference to denaturalization as a predicate to deportation as

7     something that needs to be warned about, after they have listed

8     everything else?  My question is, and this goes really to the

9     *Strickland* point.  How can it be unreasonable for counsel not

10    to warn under those circumstances when the ABA, after studying

11    it and doing all the research and everything they could, to

12    come up with every conceivable possibility, couldn't think of

13    denaturalization as a prelude to deportation as a warning

14    requirement.

15           MR. KASSEM:  Well, your Honor, even if we concede that

16    denaturalization more rare than deportation, it was not

17    unknown.

18           JUDGE WALKER:  (Unintelligible)

19           MR. KASSEM:  You have --

20           JUDGE WALKER:  (Unintelligible)

21           MR. KASSEM:  Your Honor, you have multiple Supreme

22    Court cases, you have *Kungys*, *Fedorenko*, *Costello*.  You have

23    Second Circuit cases *Reimer*, *Rossi*, *Oddo*, *Ascher*.  And you have

24    a case that comes out and that is widely reported one year

25    before Mr. Farhane's plea, *Jean-Baptiste*, which matches the

1    exact same scenario at play here today with denaturalization.

2    So, the risk was not unknown.  We found 87 denaturalization

3    cases --

4            JUDGE WALKER:  If there is a risk of harm, serious

5    harm --

6            MR. KASSEM:  Correct.

7            JUDGE WALKER:  -- then are you saying that under those

8    circumstances there should be a constitutional protection.

9            MR. KASSEM:  Absolutely, your Honor.

10            JUDGE WALKER:  If you say that -- if you say that, I

11    want to know what the limiting principle is because there are

12    thousands of different consequences.  Loss of permits, loss

13    of -- I have mentioned them already -- sexual offender

14    registration.  Things are very serious.  Being stripped of all

15    your assets.

16            MR. KASSEM:  Your Honor, the law is well-settled with

17    respect to all of these other collateral consequences that you

18    have named.  Denaturalization and deportation are the only

19    particularly severe immigration consequences that the Supreme

20    Court has mentioned --

21            JUDGE SULLIVAN:  I do think it is worth exploring what

22    are the limits if we adopt your view of the Sixth Amendment.  I

23    mean, the one that keeps coming to mind for me is, well, what

24    about extradition?  Natural born citizens who plead guilty to a

25    crime in the United States but it is a cross-border crime, so

1 they have to be advised that maybe they could be extradited to

2 a different country and face prosecution and imprisonment

3 there.

4        MR. KASSEM:  Your Honor, our contention is far more

5 modest.  If you have a defense --

6        JUDGE SULLIVAN:  Why wouldn't that be just as severe

7 and why wouldn't it be something that would matter to a

8 criminal defendant?

9        MR. KASSEM:  Your Honor, so the reason the Supreme

10 Court equated denaturalization and deportation is because they

11 are the equivalent of losing everything that makes life worth

12 living.  They are the equivalent of banishment or exile.  The

13 Supreme Court has not said that about any of these other

14 collateral consequences.

15        JUDGE SULLIVAN:  Well, if you are going to serve the

16 rest of your life in a Dominican jail that is the same as

17 banishment as well, I imagine.

18        THE COURT:  Are we talking though, about what is the

19 scope of *Padilla*?  *Padilla* focused on the increased risk of

20 deportation and being banished, in essence, from this country,

21 losing one's citizenship.  But deportation in particular, and

22 just applying the language of *Padilla*, there is the core loss

23 of citizenship that was automatic as well as even under

24 circumstances and consequences are somewhat less automatic or

25 harder to know from an immigration law perspective what they

O5M5farA

1   will be but I don't think we have to jettison the direct

2   collateral distinction wholesale in order to look at *Padilla* as

3   applicable to the increased risk that Mr. Farhane was subjected

4   to in these circumstances.  Do you think we have to go further

5   than that?

6           MR. KASSEM:  Absolutely not, Judge Kearney.  In fact,

7   again, this Court could rule in Mr. Farhane's favor in one of

8   two ways.  One would be, again, a direct application of *Padilla*

9   because he was not advised about the deportation risk.  The

10  other pathway would be to apply *Padilla*'s logic to follow

11  the steps in *Padilla* and reach the conclusion that

12  denaturalization, like deportation, is ill-suited to the direct

13  collateral --

14          THE COURT:  Then we would need to apply *Strickland* and

15  would have to look at what were the prevailing standards at the

16  time, right, and would have to look to see if he was shown

17  prejudice.

18          MR. KASSEM:  That's correct, your Honor.

19          MR. METZNER:  So we have to get past the initial:  Is

20  this a Sixth Amendment problem or is it not.

21          MR. KASSEM:  Correct, your Honor.  And once you get to

22  *Strickland*, Mr. *Padilla* has met the standard for prejudice that

23  applies under the JLV case from 2017.  There is no dispute that

24  he was prejudiced.

25          THE COURT:  I have a question about *Teague*.

1    I understand your argument about that we are just

2    applying *Padilla* so it is not a new rule.  But the standard is

3    that the result has to be so dictated by precedent that I guess

4    reasonable jurists couldn't disagree.  And so there is no cases

5    advocating the position that you are asking us to take today.

6    We are all here today.  So how is this not a new rule barred by

7    *Teague*?

8    MR. KASSEM:  Your Honor, setting aside our arguments

9    on sort of forfeiture and to respond to your question, our

10   contention is that this is merely the application of the

11   principle that governed a prior decision in *Padilla* to a

12   different set of facts and *Teague* and *Chaidez* recognize that.

13   THE COURT:  So the application of *Padilla* is so clear

14   that reasonable jurists couldn't disagree about it?

15   MR. KASSEM:  Your Honor, the application of *Padilla*

16   cannot be that you are entitled to advice about particularly

17   severe immigration consequences such as deportation unless you

18   naturalize at some point in the future.  If the conduct

19   occurred when you are a non-citizen, then you should be just as

20   entitled to the Sixth Amendments' protection, regardless of

21   what happened to you subsequently.

22   JUDGE WALKER:  *Padilla* did not involve a U.S. citizen.

23   MR. KASSEM:  Correct, your Honor.

24   JUDGE WALKER:  And there is no mention in *Padilla* of

25   denaturalization as a predicate to deportation, in so many

1    words.

2            MR. KASSEM:  And that's why, your Honor, again, citing

3    *Chaidez*, looking at *Teague* closely, we are saying this is a

4    rule of general application that was meant to apply to myriad

5    factual contexts and this is a different factual context.  We

6    get to the deportation consequence here through a different

7    pathway.

8            JUDGE WALKER:  The rule of general application and

9    part of the general application is that the collateral direct

10   distinction is not helpful, should not be used, then you are

11   saying basically something a little different from what Judge

12   Crotty said, that you would rather see this decided on a

13   case-by-case method, case-by-case analysis of each case, of

14   whether the consequence is captured or not by the Sixth

15   Amendment.

16           MR. KASSEM:  No, your Honor.  We are not saying this

17   is a case-by-case, we are merely saying apply *Padilla.*  *Padilla*

18   is about the legal effects of a conviction, the legal risk in a

19   particular plea process.  Here there was risk of a particularly

20   severe immigration consequence, two in fact --

21           JUDGE SULLIVAN:  But *Padilla* says repeatedly and

22   repeatedly "non-citizen" and you are sort of asking us to

23   ignore that and say that it really means something much

24   broader.

25           MR. KASSEM:  No, your Honor.  *Padilla* was focused on

1  deportation risk, it talked about risk of for --

2          JUDGE SULLIVAN:  No.  No, it says non-citizen.

3          MR. KASSEM:  It does say non-citizen, your Honor, but

4  that is because the class that normally deportation risk

5  applies to and there will be -- but this is also an easily

6  identifiable class of to whom deportation risk would also

7  apply.  So, again, what we are saying is not very different

8  from what lawyers are doing already.  We are only asking them

9  to really ask one more question if we are talking about trial

10 counsel in Mr. Farhane's case which is:  When were you

11 naturalized?  When did you become a U.S. citizen?  What we know

12 in this case it was obvious, trial counsel knew as early as the

13 first hearing, that he was dealing with somebody charged with

14 years-old conduct.

15         JUDGE MENASHI:  Isn't that asking the lawyers to

16 provide a different kind of advice?  Right?  So in *Chaidez* we

17 know that *Padilla* -- (unintelligible)  Because you asked this

18 predicate question about whether the Sixth Amendment even

19 applies, and you are saying we are asking the lawyers to ask an

20 additional question, *when were you denaturalized*, and so can I

21 evaluate the possible denaturalization consequences of your

22 plea.  Don't we have to answer the question as to what the

23 Sixth Amendment applies to that?

24         MR. KASSEM:  Yes, your Honor.  And again the way --

25         JUDGE MENASHI:  You are asking the same extra thing

1  here that the Supreme Court said was the extra thing that made

2  it a new rule in Padilla.

3        MR. KASSEM:  Your Honor, the new move in *Padilla*, your

4  Honors, recognized in *Chaidez*, is the recognition that

5  deportation is ill-suited to the direct collateral framework.

6  Now, *Padilla* did not work, as *Chaidez* recognized, and

7  Mr. Farhane is entitled to invoke --

8        JUDGE MENASHI:  (unintelligible) Naturalization is the

9  equivalent of that or something different because we have been

10  talking about the distinctions between a denaturalization

11  proceeding and just a deportation of a non-citizen; right?

12        MR. KASSEM:  Your Honor, again, just to be clear, one

13  way to rule in Mr. Farhane's favor is to say some deportation

14  risk here went unwarned.  Another way to rule in his favor is

15  to follow the logic of *Padilla* and to deem denaturalization --

16        JUDGE MENASHI:  The second option would be announcing

17  a new rule.

18        MR. KASSEM:  No, your Honor, it would not, it would

19  just be the application of *Padilla*'s analysis.

20        JUDGE MENASHI:  There is two ways.  The first is just

21  the application of *Padilla*, the second one is to apply the

22  logic to denaturalization proceedings.

23        MR. KASSEM:  Your Honor, section 2 of *Padilla* is a

24  part of the opinion.  Mr. Farhane can invoke any part of the

25  majority opinion in *Padilla* because his conviction became final

O5M5farA

after *Padilla* and so he can invoke the analysis in Section 2,
and applying that analysis should lead this Court to the
conclusion that the direct collateral framework is as
ill-suited --

JUDGE MENASHI:  It is not a new rule because we are
applying the same logic in different context.

MR. KASSEM:  Are applying you the analysis which, you
know, the Supreme Court in *Chaidez* recognized was the new move
in *Padilla*, it was the analysis in Section 2 of the *Padilla*
opinion.

JUDGE NATHAN:  *Padilla* involved a legal permanent
resident I think, right?

MR. KASSEM:  Correct, your Honor.

JUDGE NATHAN:  Presumably it would apply to other
kinds of deportable aliens, even if that meant an extra
question to be asked by counsel to figure out what the level of
risk was and the like?

MR. KASSEM:  Correct, your Honor.  And it has been
applied that way for folks who are not lawful permanent
residents.  And for Mr. Farhane, again, our view is that trial
counsel knew or should have known that they were advising him
to plead guilty to pre-naturalization conduct, and if trial
counsel did not know, then it was unreasonable not to ask the
question -- knowing everything that trial counsel knew it was
unreasonable not to ask the question, well, when did you become

1  a U.S. citizen?  Because that would have given trial counsel

2  all the information trial counsel needed to figure out that

3  they were advising Mr. Farhane to plead guilty to conduct that

4  was alleged to have occurred when he was still a non-citizen

5  occasioning particularly severe immigration consequences.

6  Here, it is denaturalization and deportation.  So the causal

7  chain, there may be more links in the causal chain but there is

8  still a risk of deportation that went unwarned, and so

9  Mr. Farhane --

10          JUDGE MENASHI:  Does the record tells us about the

11  prejudice question, that even if he were so advised, he would

12  have risked a 30-year sentence and not accepted the plea?

13          MR. KASSEM:  Your Honor, he would not have been

14  risking a 30-year sentence.  So let's imagine he had gone to

15  trial.  He would have faced 23 years.  Now we have looked at --

16          JUDGE WALKER:  10 years more than --

17          MR. KASSEM:  Well, your Honor, let me finish the

18  point.  He would have been sentenced, in all likelihood,

19  concurrently and not consecutively.  Sabir, one of his

20  co-defendants, was sentenced five years below the maximum.  He

21  would have been capped at 15 years.  That is a two-year delta

22  between the 13 years he got from the plea and 15 years he would

23  have been facing at trial.  That is the exact same difference

24  in *J. Lee* and in *J. Lee*, the Supreme Court said Mr. Lee had no

25  real defense at all, and the fact that it was a two-year

1    difference between what he got --

2         JUDGE MENASHI:  In *Lee* Mr. Lee kept asking about

3    deportation consequences all the time.  He was asking his

4    lawyer all the time.  Is there something like that in the

5    record here?

6         MR. KASSEM:  Well, your Honor, that is simply because

7    Mr. Farhane should not be faulted for a second time for his

8    counsel's ineffective assistance.  It is exactly what this

9    panel, what a panel of this Court recognized in *Rodriguez*.  If

10   you are not aware of the deportation risk, you shouldn't be

11   expected to talk about it.  But there is plenty of

12   contemporaneous evidence in the record, similar to *Lee*, your

13   Honor, in terms of -- and similar to cases like *Rodriguez* in

14   this circuit in terms of Mr. Farhane's tenure in this country,

15   how long he was here, the fact that he is a father to six U.S.

16   citizen children and grandchildren, the fact that he was a

17   business owner, the sole bread winner.  All of these facts

18   again with respect to Mr. Lee, who had no real defense, were

19   deemed enough as a matter of law to make out prejudice.

20        JUDGE MENASHI:  (unintelligible) that were admitted at

21   this trial where he says we shouldn't think of this as our

22   country, we shouldn't stay here in the long term.  Right?

23   Doesn't the record suggest that actually it wasn't a priority

24   to stay in the United States?

25        MR. KASSEM:  Well, your Honor, this Court should not

1    credit unsworn casual remarks.  The recordings that you are

2    referencing were recordings that were made by Mohammed Al Ansi,

3    an informant who this Court found had severely damaged

4    credibility.  Now what Mr. Farhane would have done, had he been

5    advised about the deportation and denaturalization

6    consequences, is he would have called Mr. Al Ansi the same as

7    the Al Moyed defendants did, he would have exposed him and his

8    lack of credibility and Mr. Al Ansi attempted to self-emulate

9    in front of the White House.  All of this was known at the time

10   of Mr. Farhane's plea.  Had Mr. Farhane been advised --

11              JUDGE MENASHI:  So your argument is the recordings are

12   not genuine?

13              MR. KASSEM:  Your Honor, our argument is that he had a

14   viable defense, and frankly under the *Lee*, standard he doesn't

15   even need any --

16              JUDGE MENASHI:  What?  That the person who made the

17   recordings?

18              MR. KASSEM:  Is unreliable, he had an entrapment

19   defense.  We don't even have complete recordings, your Honor.

20   The trial counsel noted that there were conversations that went

21   unrecorded, there were conversations that were cut short.  All

22   of that is in the record before this Court.  That is more than

23   enough.  There is a surfeit of evidence here to make out the

24   prejudice standard in *Lee*.  The prejudice standard in *Lee*, the

25   bar is actually very low compared to what we have in this case.

1  In *Lee* he had no defense at all, he had deep U.S. ties.

2  Mr. Farhane had real defenses and the same U.S. ties and he is

3  a U.S. citizen.  He has more to lose than Mr. Lee.  Mr. Lee was

4  a lawful permanent resident.  And the concomitant --

5  　　　　　THE COURT:  So isn't it the case that Mr. Lee had

6  reason to be asking repeatedly about whether he was vulnerable

7  to losing his citizenship, whereas Mr. Farhane had no reason,

8  as many people who are naturalized citizens think, it is

9  permanent and can't be undone.

10  　　　　　MR. KASSEM:  Absolutely, your Honor.  Mr. Lee was a

11  lawful permanent resident and so he had reason to ask those

12  questions.  Mr. Farhane felt safe and was relying on counsel.

13  It was counsel's job, the onus was on counsel to advise

14  Mr. Farhane about the denaturalization and deportation risks

15  here.  Mr. Farhane is a layperson.  There is no way for him to

16  know what the legal consequences might be of a plea.  He was

17  relying on counsel, as he should, and he was not advised.

18  　　　　　JUDGE SULLIVAN:  Let me just see if there is any other

19  questions.  Maybe one more.

20  　　　　　JUDGE WALKER:  The only question I want to ask is we

21  are looking at this case now through the lens of what happened

22  in 2017 and the habeas corpus petition and all that has been

23  generated by that.  Once we get to the question of ineffective

24  assistance of counsel we are confined to the period prior to

25  the plea, that is the universe, that is the context in which

1  the plea was taken.  Under those circumstances I don't see how

2  we get to the point where this was the kind of information

3  that, at that time, counsel would be required to notify his

4  client on because of the fact that it was extremely rare, we

5  know that as has been cited there were a handful of cases

6  through the country, I think 150 cases; very, very rare; and

7  then, in addition to that, there wasn't a great deal of

8  information that counsel had.  He knew that his client was a

9  naturalized citizen, period.  He didn't know anything about the

10  context of that naturalization proceeding, the timing of it,

11  what he might have said at the time, whether or not he had lied

12  to the INS officer, any of those things.  And what is more, the

13  ABA findings -- and I keep going back to that, about the

14  consequences that need to be warned -- did not even include

15  this at the time as it was so rare.

16      MR. KASSEM:  Well, your Honor, two points in response

17  and I will conclude.  I mean rarity simply does not enter into

18  the *Padilla* analysis.  Not once in *Padilla* does the Supreme

19  Court look at whether the immigration consequence is rare or

20  not.  That is simply not the --

21      JUDGE WALKER:  (Unintelligible) I'm not talking about

22  *Padilla* here, I am assuming here your point, if we accept your

23  point on *Padilla* and so that the Sixth Amendment means that it

24  is not off the table, you pass the threshold, you still have to

25  show *Strickland* was complied with.

1    MR. KASSEM:  Yes, your Honor.  And again, prevailing

2  professional norms, I won't repeat the points about that, it is

3  your point about trial counsel not knowing.  I will cite some

4  ABA standards for you from 1999.  The criminal justice

5  standards required counsel to be active, not passive.  Again,

6  all counsel had to do was to ask a question.

7    JUDGE WALKER:  (unintelligible)  Statements about that

8  but in terms of actually listing all the consequences the ABA

9  didn't come up with denaturalization as a possibility and

10  deportation was solely confined to non-citizens.

11    MR. KASSEM:  Respectfully, your Honor --

12    JUDGE WALKER:  If he had gone and looked at the actual

13  ABA 1999 standards he could have come to the same conclusion.

14    MR. KASSEM:  Well, your Honor, the prevailing

15  professional norms reflected in contemporaneous authorities

16  cited by the Supreme Court speak of denaturalization, perhaps

17  they don't speak of it as much as deportation but it is in

18  there.  There is a lot of case law.  There were no fewer than

19  87 civil denaturalization cases brought in the five years

20  preceding Mr. Farhane's plea.  Now, if trial counsel didn't

21  know something, and we think he knew or should have known, but

22  he was really one question away from having all the knowledge

23  he needed to properly advise his client and meet the

24  constitutional standard and he really didn't have to say much

25  because of lack of clarity in the law, he could have said

1    something, there is a risk.

2           JUDGE SULLIVAN:  You would agree that once we are in

3    *Strickland*-land we are looking at 2006?

4           MR. KASSEM:  Your Honor, absolutely.  And I am

5    referring to contemporaneous records.

6           JUDGE SULLIVAN:  It is as a simple question.  I didn't

7    want any more.

8           MR. KASSEM:  Absolutely, your Honor, it is

9    contemporaneous record evidence.

10          JUDGE WALKER:  You can't use hindsight to try to judge

11   these cases.  That is in *Strickland* very clearly.

12          THE COURT:  Mr. *Padilla*'s plea was in what year?

13          MR. KASSEM:  Mr. *Padilla*'s plea was in 2001, and the

14   *Padilla* decision came down in 2010.

15          And so your Honor, to your point -- just one last

16   thing.  Of course the Court should look to contemporaneous

17   record facts and there is ample contemporaneous evidence, but

18   this Court in *Doe* credited the 2255 affidavit.  Mr. Farhane --

19   so this Court can do that as well, you can look to --

20          THE COURT:  *Padilla* is 2010 Supreme Court.

21          MR. KASSEM:  Yes.

22          THE COURT:  Farhane's conviction is 2007.

23          MR. KASSEM:  Your Honor, the Supreme Court decision

24   was in 2010.  Mr. Farhane's conviction became final after

25   *Padilla*.

O5M5farA

1          THE COURT:  I'm sorry.

2          MR. KASSEM:  In 2011.

3          THE COURT:  And the pleas were in 2004 and 2006, I

4    thought.  I thought *Padilla*'s plea was 2004.

5          MR. KASSEM:  Correct, your Honor.  My apologies.  I

6    misstated that earlier.

7          Thank you.

8          JUDGE SULLIVAN:  Thanks very much.  You have got five

9    minutes for rebuttal.  We will hear now from Mr. Metzner.

10          MR. METZNER:  May it please the Court:  The district

11    court's denial of Mr. Farhane's 2255 motion should be affirmed

12    for three different and independent reasons.  First, the Sixth

13    Amendment does not extend to advice about the collateral

14    estoppel effects of a guilty plea in a subsequent

15    denaturalization proceeding because that is not a direct

16    consequence of the plea.  This Court has long used --

17          THE COURT:  I'm sorry to interrupt, but are you saying

18    that it doesn't extend -- the Sixth Amendment doesn't extend to

19    advice by denaturalization?

20          MR. METZNER:  That's correct, your Honor, it does not.

21          THE COURT:  So you were focusing on collateral

22    estoppel but really what you are saying is you never have to

23    advise about the risk of denaturalization; is that right?

24          MR. METZNER:  Your Honor, what I am saying is that the

25    obligation of defense counsel does not extend to the collateral

1  estoppel usage in a subsequent proceeding of a guilty plea.

2  And that is what is going on here.

3          THE COURT:  I'm still -- so if counsel knows that his

4  client will be denaturalized by virtue of following, as a

5  consequence of a guilty plea to a criminal charge, he has no

6  obligation to advise because the denaturalization is

7  collateral?

8          MR. METZNER:  Your Honor, the Sixth Amendment defines

9  what his obligations are, not his own knowledge or any

10  collateral consequences.  There are a lot of different

11  collateral consequences that can be considered very severe --

12          THE COURT:  I realize, but I am asking you whether in

13  the government's view counsel never has a Sixth Amendment

14  obligation to advise that denaturalization is a risk.

15          MR. METZNER:  Your Honor, that is correct.  What

16  counsel has to do --

17          THE COURT:  No obligation at all, it is collateral?

18          MR. METZNER:  That's correct, your Honor.  They have

19  to advise about the direct consequences of a guilty plea, and

20  in the *Padilla* case itself, which is not the same as this one,

21  what the Court focused on was simply that the direct collateral

22  distinction wasn't the best tool for looking at the scope of

23  the Sixth Amendment.  Instead --

24          JUDGE NATHAN:  But what about misadvice about

25  denaturalization?

1          MR. METZNER:  Your Honor, that's a completely

2     different category.

3          JUDGE NATHAN:  So misadvice about denaturalization is

4     within the Sixth Amendment right?

5          MR. METZNER:  Absolutely, your Honor, and that is what

6     *Chaidez* in fact said, that those cases, quote, exist in harmony

7     with one another, that misadvice goes to the decision-making of

8     the defendant and that could involve lots of different things

9     if it is wrong.  So misadvice, even about something that a

10    lawyer had no obligation to advise about, may very well have

11    rendered ineffective assistance by convincing the defendant

12    that there was something that wasn't true.  And that's why

13    those cases have existed for years.

14         JUDGE NATHAN:  Collateral effects are in in the

15    context of misadvice but not within the Sixth Amendment scope

16    within the context of the failure to inform?

17         MR. METZNER:  Well, your Honor, when you talk about

18    misadvice you are talking about what was the advice rendered as

19    part of the criminal defense by the lawyer and whether that was

20    effective assistance of counsel or not.

21         JUDGE NATHAN:  I am just asking if it is within the

22    Sixth Amendment right or not, if counsel gives misadvice about

23    the collateral consequences of the plea with effect to

24    denaturalization, is it within the Sixth Amendment or not.

25         MR. METZNER:  Yes, your Honor.  Absolutely it is.

1   Misadvice about many issues, including the collateral

2   consequences for losing law licenses, for example, for being

3   subject to restraining orders, being subject to sexual offense

4   registration could --

5          JUDGE NATHAN:  On the flipside let me ask, in the

6   removal context, in the deportation context, there are --

7   counsel made this point a couple times -- there are

8   non-crime-based grounds for removal; correct?

9          MR. METZNER:  That's absolutely true, your Honor.

10          JUDGE NATHAN:  So if you are in the criminal context

11  and you are pleading to a crime that is not grounds for

12  removal, but in the course of that allocution, in the course of

13  that plea you admit or you would admit to conduct that would

14  make you removable in a removal proceeding, does the Sixth

15  Amendment apply with respect to failure to advise with respect

16  to that?

17          MR. METZNER:  Yes, your Honor.

18          What the Court said in *Padilla* was they wanted to make

19  sure they weren't going to deal with those outlying cases.

20  Instead of being concerned about those scenarios, which is the

21  occasional case where the conviction itself is not the basis

22  for a deportation order, the vast majority of the serious

23  criminal cases in this country for non-citizens result in

24  deportation solely because of the conviction itself.

25          JUDGE NATHAN:  But even still, even if it is not a

1    direct consequence because there might be uncertainty or lack

2    of clarity, the Sixth Amendment requires counsel to give

3    warning as to that risk?

4            MR. METZNER:  They did, your Honor, because of --

5            JUDGE NATHAN:  Even though it is not automatic from

6    the crime being pled to.

7            MR. METZNER:  But what the Court in *Padilla* said, your

8    Honor, is that it is almost always automatic and rather than

9    dealing with the Edge cases and occasionally when it is not,

10   the more appropriate interpretation of the Sixth Amendment was

11   simply to say that because of the direct linkage between the

12   conviction and deportation in the way the deportation statutes

13   have now been developed, that it was appropriate to say that

14   falls within the Sixth Amendment guarantee of effective

15   assistance of counsel.

16           JUDGE NATHAN:  And so let me ask, Mr. Farhane's plea

17   here, would you say that it substantially increased his risk of

18   deportation?

19           MR. METZNER:  Your Honor, I don't think it does.

20           JUDGE NATHAN:  Did it increase his risk of

21   deportation?

22           MR. METZNER:  What it did was ease the government's

23   evidentiary burden in a subsequent denaturalization petition.

24           JUDGE NATHAN:  So there is a higher risk of things

25   that are easier, are there not?

1          MR. METZNER:  Well, your Honor, it certainly eases the

2     burden of proof.  There is no doubt about it, the government is

3     relying on the collateral estoppel effects in the

4     denaturalization proceedings.  That is absolutely true.

5          JUDGE NATHAN:  So, therefore those effects, you won't

6     concede, increase the risk?

7          MR. METZNER:  I won't, your Honor, because the

8     possibility of denaturalization was present before or after the

9     guilty plea.  It was the conduct that led to the risk of

10    denaturalization, not the guilty plea.

11         JUDGE NATHAN:  So does it carry the risk even if it

12    doesn't increase it?  There is a risk.  It carries the risk but

13    it doesn't increase the risk, fair to say?

14         MR. METZNER:  I don't know -- your Honor, certainly

15    the government submits that it is evidence that supports the

16    three claims in the denaturalization petition is very strong

17    regardless of the use of the guilty plea.

18         JUDGE NATHAN:  You agreed to stay the denaturalization

19    proceeding here?

20         MR. METZNER:  At Mr. Farhane's request, yes, the

21    government did agree.

22         JUDGE NATHAN:  And you are not proceeding --

23         JUDGE MENASHI:  He didn't have to --

24         THE COURT:  The government seeks to denaturalize

25    Mr. Farhane because he doesn't have good moral character is the

1  assertion of the government, correct?

2        MR. METZNER:  That's Counts One and Two, your Honor;

3  yes.

4        JUDGE WESLEY:  The factual premise of that is that he

5  committed a crime -- that he committed a crime.

6        MR. METZNER:  Unlawful acts; that is Count One, your

7  Honor.

8        JUDGE WESLEY:  There is also another factual premise

9  that he lied about it on his application for citizenship and

10 that he lied about it during a citizenship interview, correct?

11        MR. METZNER:  That's correct.

12        JUDGE WESLEY:  Just focusing on the lies, can a

13 citizen who (unintelligible) who commits a crime and lies about

14 it on naturalization application, are they subject to

15 denaturalization proceeding subsequently when that lie is

16 discovered?

17        MR. METZNER:  Yes.  That's possible, your Honor.

18        JUDGE WESLEY:  And presume that this citizen or this

19 immigrant that I have described is not the subject for

20 deportation, doesn't qualify as an aggravated felony, doesn't

21 qualify as any grounds for removal.  There is no connection

22 between the criminal process and the immigration process -- or

23 the naturalization process at that point, correct?

24        MR. METZNER:  That's correct, your Honor.

25        JUDGE WESLEY:  However, if someone is a naturalized

1    citizen and commits a crime, that can also serve as grounds for

2    removal, then the immigration process for the status of a

3    nationalized citizen who is an immigrant who has committed a

4    crime and the criminal process have some relationship to each

5    other?

6         MR. METZNER:  I don't know that they do, your Honor,

7    and it brings me to a point I would like to clarify because my

8    counsel --

9         JUDGE WESLEY:  (unintelligible) because he becomes

10   denaturalized.

11        MR. METZNER:  Your Honor, the removal has to be a

12   separate proceeding.

13        JUDGE WESLEY:  Right, but one doesn't -- it if

14   Mr. Farhane had committed a DWI or driving while impaired,

15   which is a misdemeanor in New York, if he pled guilty -- it is

16   not a misdemeanor -- driving while intoxicated, we are going to

17   go back to misdemeanor.  If he committed driving while

18   intoxicated, he could be removed for it.  The fact that his

19   lawyer didn't know a hoot about the effect on his

20   naturalization doesn't seem to be -- I mean, it doesn't seem

21   as -- seem to fit the *Padilla* kind of construct, does it?

22        MR. METZNER:  It doesn't, your Honor, and that's the

23   whole point, was that in *Padilla*, the linkage between the

24   conviction itself and the resulting deportation is what the

25   Court found to be so compelling and what made it different than

1   the direct collateral distinction that it chose not to use in

2   that case.

3           JUDGE WESLEY:  If he is pulled over for a DWI and they

4   found a gun in his car, he is then charged with possession of a

5   weapon which would then become grounds for removal, doesn't the

6   criminal process and the immigration process inch closer

7   towards each other, become more *Padilla*-like again?

8           MR. METZNER:  Again, your Honor, if you are talking

9   about a non-citizen, of course it does under *Padilla* itself.

10  Your haptical I believe posits a naturalized U.S. citizen.

11          JUDGE WESLEY:  I am trying to understand how big

12  (unintelligible) *Padilla*, because what your brief says is

13  *Padilla*-plus and would involve *Teague* and say that *Padilla*

14  includes these folks because they're trying to extend *Padilla*.

15  Now there is -- (unintelligible) the argument that *Padilla* fits

16  nicely around the immigration context.  I am trying to

17  understand if *Padilla* changes something, is it applying *Padilla*

18  to Mr. Farhane's circumstances or does *Padilla* answer all the

19  questions?

20          MR. METZNER:  Your Honor, it is absolutely a new rule

21  for several reasons.  First of all, *Padilla* itself used the

22  word "unique" more than once in the opinion itself, so --

23          THE COURT:  About deportation.

24          MR. METZNER:  Yes, your Honor.

25          THE COURT:  That is what we have been focusing on

1    here, some of us, is deportation, the risk of deportation being

2    heightened by the plea or the plea carrying the risk of

3    deportation, yes, there is an intermediate step of

4    denaturalization, but if you focus on the deportation

5    consequence, that was what was said was unique and that's why

6    it was removed from the direct collateral framework.  Isn't

7    that correct?

8              MR. METZNER:  Your Honor, certainly the connection

9    between the conviction and the deportation was in fact what the

10   *Padilla* Court was thinking about, but I would like to emphasize

11   something here that I don't think was made clear by the

12   defendant which is Mr. Farhane's conviction is not necessarily

13   sufficient to deport him if he becomes no longer a citizen if

14   he is denaturalized.  The reason, your Honor, is that he

15   committed the offense, which is an aggravated felony, while he

16   was a citizen of the United States.  The government has argued

17   in other courts in other circumstances that such a scenario --

18   that is, an individual commits an aggravated felony after being

19   denaturalized, then is denaturalized and now having been

20   convicted of an aggravated felony is subject to being deported

21   as under the aggravated felony provisions.  Two circuits have

22   rejected that argument the Third Circuit and the Eleventh

23   Circuit have both held that the aggravated felony committed

24   during the term of citizenship cannot also be the basis for a

25   deportation once citizenship is revoked.  So, the idea that

1    Mr. Farhane has an automatic ticket to deportability is simply

2    not true.  It isn't --

3              THE COURT:  Excuse me just a second, though.  When I

4    was looking at the denaturalization complaint I was struck by

5    the number of times the government said that the Court has no

6    discretion in acting on this -- and this is related to the

7    collateral estoppel point, I suppose -- but that the grounds

8    for denaturalization are established and I know that there are

9    defenses that have been preserved, but still, that was the

10   government's premise in proceeding.  And the Justice Department

11   has advised us that the government doesn't seek

12   denaturalization because why would you, unless you intended to

13   pursue deportation as well?

14             So where are the holes in that chain of logic?

15             MR. METZNER:  Two, your Honor.  The first is that the

16   discretion the government is talking about is simply that once

17   the elements have been established for denaturalization, then

18   the Court does in fact need to enter an order of

19   denaturalization.  But as has been discussed here already, in

20   each of the three counts pending against Mr. Farhane in the

21   denaturalization petition, there are defenses that he has the

22   opportunity to raise and will be ruled upon by the Court.  So

23   nothing about his conviction makes the Court have to

24   necessarily enter judgment against him for any of those three

25   counts yet.  All three of them have defenses he can raise.  So

1    when the defendant was talking about the lack of discretion, it

2    is only once the government has established the basis for

3    denaturalization.

4            Second, your Honor, I want to emphasize, if in fact

5    Mr. Farhane were to be denaturalized, he becomes to his prior

6    status, and that is as a permanent resident of the united

7    states.  A permanent resident convicted of an aggravated felony

8    is, as we have discussed here, almost immediately deportable

9    and that is the reasoning behind *Padilla* in the first place.

10   But as I said, in the Hilton case and the Soon case, that's the

11   Third Circuit and the Eleventh Circuit, those courts of appeals

12   have said the government can't rely on an aggravated felony

13   that is committed and convicted while the person is a citizen,

14   who then gets denaturalized, to then say you have been

15   convicted of an aggravated felony --

16           THE COURT:  So you are telling us that some courts

17   have said that it is not so automatic but isn't that still a

18   severe risk?  I mean, we don't know how other courts -- and

19   this court in particular -- might decide that question, do we?

20           MR. METZNER:  Your Honor, the difference is the links

21   in the chain are so substantial and attenuated from the

22   original conviction that it doesn't have the connection that

23   *Padilla* was insisting on.  *Padilla* said the reason we are

24   taking this out of the direct collateral distinction, which I

25   should emphasize is not being advocated to be abandoned by

1    anybody in this case and should be, continue to be used, is

2    because of the direct linkage between the conviction itself and

3    the deportation.  And that is absent in this case.  The

4    denaturalization doesn't depend on the conviction itself, nor

5    does, necessarily, even the deportation.  The government will

6    argue, and it has argued in the courts that I mentioned, that

7    it does qualify.  I want to be clear about that.  I don't want

8    to undermine my colleagues in the OIL.  But, the fact is that

9    two courts have ruled that it is not good enough so the

10   government is 0 for 2 right now on this particular argument in

11   the United States Courts of Appeals.

12        JUDGE MENASHI:  Is your argument in the

13   denaturalization proceeding that he committed the conduct

14   during the five-year period before he filed the naturalization

15   application and so, therefore, it would have done it before

16   becoming a citizen, right?

17        MR. METZNER:  That's correct, your Honor, and that's

18   the basis for the denaturalization.  What I was talking about

19   is the basis for a subsequent deportation would be the

20   conviction for an aggravated felony.  Of course, that was

21   sustained after he was a citizen.

22        THE COURT:  I would like to shift.  We have talked a

23   lot about the lawful permanent residents and the deportation

24   consequences and convictions and we are talking about citizens

25   and their risk of deportation which sort of mediates with the

1  denaturalization process, naturalized citizen.  I want to talk

2  about somebody who is here, who is not a lawful permanent

3  resident, not a citizen but has asylum so they're an asylee.

4  Are they protected under the umbrella of the recognition

5  (unintelligible) the Sixth Amendment right to counsel includes

6  immigration advice about the deportation consequence.

7           MR. METZNER:  Absolutely, your Honor.  They're a

8  non-citizen.  *Padilla* applies to any non-citizen.

9           THE COURT:  OK, but in the case of the asylee, if the

10 mechanism for deporting someone with asylum is that you first

11 have to terminate their status as an asylee and then bring a

12 separate removal petition, so it is a process that looks

13 remarkably parallel to denaturalization followed by removal, I

14 am trying to figure out how it is different and why we would

15 think that the non-citizen has greater rights under Farhane

16 than a citizen for whom the same two-step process to

17 deportation with an equal level of sort of likelihood flowing

18 from the conviction.

19          MR. METZNER:  Respectfully, your Honor, they don't

20 have greater right, they are simply different situations.  And

21 the reason is that for a non-citizen the risk of the

22 deportation connection between the conviction itself for

23 asylees, as well as permanent resident aliens, is substantial

24 because of the way the statutes are operating.  The lack of

25 discretion on the part of the government to stop it, the lack

1    of any real defense --

2            THE COURT:  So terminating asylee status, if the

3    government has to prove that you were convicted of a

4    particularly serious crime and constitute a danger to the

5    community of the United States, so in other words there is an

6    evidentiary showing above and beyond the mere fact of

7    conviction, conviction is necessary but not sufficient reason

8    for terminating asylum status, why isn't that on all fours with

9    the denaturalization as a first step to removal for a citizen?

10           MR. METZNER:  Your Honor, because the discretion in

11   the government to bring a denaturalization petition is

12   substantial and has been for more than a hundred years.

13           THE COURT:  Does the government not have discretion as

14   to whether or not to seek to terminate someone's asylum status?

15   Where does that come from?

16           MR. METZNER:  They do, your Honor, but the way the

17   discretion has been exercised in the past is certainly relevant

18   to assessing the directness of the connection between the

19   conviction and the result in this case of deportation in the

20   country.

21           JUDGE MENASHI:  (unintelligible) *Padilla* means by

22   automatic, so opposing counsel said a moment ago that automatic

23   means the effect of the conviction once the government decides

24   to bring an immigration proceeding.  Do you agree with that?

25           MR. METZNER:  No, your Honor.  *Padilla* spent a lot of

time in the opinion itself talking about how the immigration

laws had evolved to the point where once an individual is

convicted, in most cases of a sufficiently serious felony, that

the process for that person to then be sent out of the country

happens automatically, that is, there is very little discretion

in any aspect of the process along the way before that person,

who has simply been convicted, without regard to the underlying

fact of the conviction or anything else about the person, but

rather the conviction itself being the basis for that person

being sent out.  So, in the asylum context, your Honor, yes,

that's a little bit different.  But, again, what *Padilla* was

saying was we are going to assess immigration as it affects

non-citizens and simply say, OK, those are the folks, because

of the connection between deportation and convictions, any

person who is facing, who is a non-citizen, we are going to

make sure they are warned about the consequences of their

conviction.

THE COURT:  If the distinction that you are relying on

is that *Padilla* protects non-citizens but not citizens, that

feels like an incongruous distinction.  I thought what you were

relying on was the, *oh, it is two steps and there has to be*

*discretion about whether to bring denaturalization and there is*

*other showings that can be made.*  Those, all of those

considerations, I think they apply largely to removal of a

lawful permanent resident but think clearly apply to somebody

1    who has got asylum status whose status has to be terminated as

2    a first step even though, in practice, the two are generally, I

3    imagine, I don't have statistics on this, but my sense is that

4    they're generally linked and have been kind happen kind of as a

5    two-step.

6            MR. METZNER:  Your Honor, I think they're both sides

7    of the same coin, that is, the process involved as well as the

8    links between the two.  What *Padilla* said was because of the

9    way the immigration statutes have evolved, there is this close

10   connection between the conviction and the deportation and so we

11   are going to ensure that defense lawyers advise their clients,

12   before they plead guilty, that there is this risk of

13   deportation.

14           THE COURT:  And when it does that it looked at the

15   removal statute as it related to lawful permanent residents and

16   I guess what I am trying to figure out is that you are not

17   saying that *Padilla* is limited only to that scenario.

18           MR. METZNER:  I'm not, your Honor.

19           THE COURT:  As soon as you start saying there are

20   other immigration consequences that lead to deportation that

21   aren't within the scope of *Padilla* then you have to have a

22   principled explanation for why the asylee is protected by the

23   *Padilla* reasoning and that a citizen is not.  I guess what it

24   comes down to is you don't think *Padilla* cares about the exact

25   same consequences through the exact same type of mechanism for

1    citizens where it does for non-citizens.

2          MR. METZNER:  I think what *Padilla* cares about is

3    ensuring that a defendant is aware of the risk of deportation

4    connected to their guilty plea.  That is what *Padilla* wanted to

5    do, was to ensure that if there is a risk that you need to know

6    about before you plead guilty, we are going to make sure that

7    you are aware of that before you enter your guilty plea because

8    of the direct connection in many cases between the conviction

9    and the deportation.  That's what *Padilla* was most concerned

10   about.

11         THE COURT:  Isn't that an overread?  I mean, it is

12   just a risk of deportation, it doesn't say it has got to be a

13   99 percent certainty, it doesn't say it had has to be two steps

14   versus one step.  And in the same breath it is actually --

15   *Padilla* is actually talking about the responsibility to ensure

16   that no criminal defendant, whether a citizen or not, is at the

17   mercy of an incompetent counsel.

18         MR. METZNER:  You are right, your Honor, but I think

19   what is clear from the discussion that we have been having is

20   that the Court was simply not trying to deal with the idea that

21   every single conviction will necessarily lead to deportation.

22   Rather than have a defendant and their criminal defense lawyer

23   trying to assess those Edge cases about whether or not a

24   particular conviction may or may not fall within this --

25         THE COURT:  We have lawyers because of Edge cases,

O5M5farA

1  right?  That's why you hire lawyers.  Because every criminal

2  defendant has a peculiarity in front of them that is going to

3  require specific counsel as to the specific risks that he or

4  she faces.  So I'm not sure why you can just argue that these

5  Edge cases are not part of what we are trying -- or not -- were

6  not being contemplated.

7          MR. METZNER:  Because the Supreme Court was focused on

8  what falls within the criminal prosecution as defined by the

9  Sixth Amendment and that's how we have to draw the lines.  What

10  does the Sixth Amendment require a defense lawyer do on behalf

11  of their client?  It has to defend that person in criminal

12  prosecutions for their defense and what the Supreme Court was

13  saying and has said is that what we are talking about has to be

14  something, as was discussed earlier, that first has to be

15  determined to fall within the Sixth Amendment in the first

16  place before you then take the next step to determine whether a

17  lawyer rendered effective assistance in dealing with it.

18          THE COURT:  Didn't the Supreme Court say stuff that

19  has a risk of deportation falls within the Sixth Amendment?

20          MR. METZNER:  I don't agree, your Honor.  I think what

21  they said was the risk of deportation falls within the Sixth

22  Amendment but they said in connection with the criminal

23  conviction itself.  So what they said was if you have a

24  criminal conviction and there is a link there, that is what

25  makes deportation unique, unique to the circumstance where we

1  are not going to rely on the direct collateral distinction and

2  we are going to define the Sixth Amendment in a way that says

3  because of those two factors, the severity and the direct

4  linkage, that that risk of deportation falls within the scope

5  of the Sixth Amendment.  But here, Mr. Farhane didn't face the

6  same situation.  Mr. Farhane was, in 2006, a naturalized

7  citizen.  The only information his lawyer had was that he was

8  in fact a naturalized citizen.  There is no evidence in the

9  record to support the fact of when his naturalization occurred

10  or even, more importantly --

11          JUDGE NATHAN:  But your view is even if he had that

12  information, no obligation to warn him of the risk; right?

13          MR. METZNER:  That's correct, your Honor; that there

14  was no professional norm that existed in 2006 to tell a defense

15  lawyer that beyond the idea of a risk of deportation --

16          JUDGE NATHAN:  So that's a rule that says, going

17  forward, counsel knows my client is a naturalized citizen,

18  knows when naturalization happened, knows that the conduct

19  being pled to involves crimes pre-naturalization, and knows

20  that there was a misstatement on the naturalization form,

21  better not to say anything because there is no Sixth Amendment

22  obligation but if I do say something, if I misadvise -- *Padilla*

23  was concerned with this distinction -- I might misadvise, which

24  would trigger what you have conceded is within the Sixth

25  Amendment.

1          MR. METZNER:  No, your Honor, I don't agree that it

2     would be better not to say anything.  In fact, the ABA

3     standards provide for a whole laundry list of things that a

4     defense lawyer should talk about with their client including

5     collateral consequences.  That is not the same thing, though,

6     as saying the Sixth Amendment requires them to do so in every

7     criminal case.  So I disagree with your premise that a defense

8     lawyer would actually shy away from having those conversations.

9          JUDGE NATHAN:  Wasn't that part of the reasoning in

10     *Padilla* in rejecting a narrowing of the case to misadvice?

11     That if we make that -- maybe not the holding but it is part of

12     the reasoning, if we make that distinction, it will incentivize

13     lawyers not to advise in that context, correct?

14          MR. METZNER:  They certainly addressed that issue,

15     your Honor, but again what *Chaidez* said was to make clear that

16     that that kind of an issue was really a secondary concern.  The

17     secondary concern, as we discussed earlier about the misadvice

18     itself being ineffective assistance by bad advice, regardless

19     of the subject matter if in fact it prejudiced the defendant

20     and caused him to plead guilty whether they wouldn't have.

21          So, the misadvice universe is simply a separate

22     category than the affirmative obligations of the Sixth

23     Amendment and it can include things that aren't required.  But

24     the professional norms as in the ABA guidelines about what is

25     advisable for the defense lawyer to tell their client, that

1    doesn't change what the sixth amendment requires them to do, it

2    is the other way around.  The Sixth Amendment defines whether a

3    certain conduct has to be taken by a defense lawyer and then,

4    once this Court is in the area of what the Six Amendment

5    covers, then the ABA standards and other professional norms

6    have a role to play in determining how well the lawyer did or

7    did not do their job.  So, you cannot define the Sixth

8    Amendment by basis of the ABA stance, it is the other way

9    around.

10              JUDGE WALKER:  It is a constitutional minimum that is

11    about to trigger, the question is like a direct consequence, if

12    it is covered under the Sixth Amendment.

13              MR. METZNER:  That's correct.

14              JUDGE WALKER:  And then at that point there is a whole

15    new analysis now as to what the norms were at the time, what

16    was going on, if the attorney's performance was reasonable

17    under the circumstances.

18              MR. METZNER:  Yes, your Honor.

19              THE COURT:  I know with regard to *Strickland* you think

20    we don't get as far as prejudice but I did have a question that

21    is related to denaturalization for you.

22              You wrote in your brief that Farhane repeatedly claims

23    that two of his children will also be denaturalized if he is

24    denaturalized.  You say he has not identified any basis to

25    believe the government will attempt to denaturalize, much less

1   deport his children, but it seemed to me that under 18 U.S.C.

2   1451(d) that if you claim citizenship through a parent who

3   loses his citizenship by virtue of subsection (a) of this 1451,

4   that you shall be deemed to have lost and lose your citizenship

5   as well.  It seemed to me that that was an operation of law,

6   loss of citizenship.  I don't know what follows in terms of

7   deportation or whether someone might be able to regain

8   citizenship, but am I wrong in understanding that that was --

9   that two of his children at least will lose their citizenship

10  by operation of law if he is denaturalized?

11          MR. METZNER:  Not necessarily, your Honor, and I will

12  explain why.  First --

13          THE COURT:  I'm not wrong or it does not necessarily

14  happen?

15          MR. METZNER:  It does not necessarily happen and let

16  me explain why, your Honor.  That same subsection, 1451(d),

17  makes clear that the only basis for denaturalizing derivative

18  citizens is if the naturalization was procured by willful

19  misrepresentation or concealment.  That is one of the two

20  prongs of 1451.  Only Count Three in this case alleges that

21  Mr. Farhane procured his naturalization by willful

22  misrepresentation or concealment.  The government could choose

23  not to go forward on Count Three rather than Counts One and

24  Two.

25          And, your Honor, the other thing is even if the

government went forward on all three counts and succeeded in a
denaturalization order against Mr. Farhane, it is not at all
clear that absent another proceeding with respect to his
children, that that citizenship would be revoked.

THE COURT:  But it is correct that as the indictment
stands now, the charge now, it includes the concealment?

MR. METZNER:  It does, your Honor.

THE COURT:  And that flows through 1451(d) and the
statutory text says:  Shall be deemed to have lost and lose
citizenship.  Correct?

MR. METZNER:  That is absolutely what it says, your
Honor.  But, in fact, there is a proceeding probable that as
any sort of important right there is usually a due process
element associated with it.  So if there was an effort to
revoke the documents of citizenship, for example, the
immigration service has to give notice to the individuals, give
them a chance to be heard before even, say, a passport
revocation or other things like that.

THE COURT:  So it is fair to say at least they're at
risk by operation of the statute; is that right?

MR. METZNER:  That is absolutely right, your Honor.
The possibility exists but, again, there are nuances here,
there are a lot of steps that still have to happen which is
what takes it away from the *Padilla* situation where it is just
going to happen without anything else happening.

1          THE COURT:  I am not talking about the Sixth Amendment

2   right of the children, I am talking about whether Mr. Farhane

3   might legitimately take that into account or might have taken

4   that into account had he been properly advised in assessing the

5   risks of going to trial or not.

6          MR. METZNER:  Again, your Honor, there are a lot of

7   things that happen as a consequence of guilty pleas that

8   defendants may value over others.  There is no question about

9   whether that is true.  But the real question is whether a

10  defense lawyer, in a criminal case whose job it is to focus on

11  the criminal consequences for that client, have an obligation

12  to advise the defendant about all of those potential

13  consequences that are not directly linked to the conviction.

14         THE COURT:  Well, but *Lee* took a broader view, didn't

15  it, about whether the deportation consequences were of such

16  priority of the defendant that it was reasonable and rational

17  for the defendant to take that into account in deciding how to

18  proceed in his criminal defense?

19         MR. METZNER:  Certainly the *Lee* case --

20         THE COURT:  In a very personal way, right?

21         MR. METZNER:  The *Lee* case had a lot of

22  dissimilarities to this one, your Honor.

23         THE COURT:  Yes.  He was aware that he might be

24  deported.

25         MR. METZNER:  He kept saying that was the most

1  important issue for him.  Also, another issue, and it is

2  important because I believe I need to correct my colleague here

3  that the delta between conviction and plea in that case was

4  much lower.  The delta here, to be clear, was 10 years.  10

5  years.  He was facing 23 years in prison upon conviction at

6  trial.  His co-defendant went to trial and got 30 years.  So,

7  the idea that he was facing only a couple of years difference

8  is false based on the record.

9           THE COURT:  Counsel, how do you explain his statement

10  today about that it was a 15-year cap?  How do you respond to

11  that?

12           MR. METZNER:  I believe he was talking about one of

13  his co-defendants who pled guilty earlier to a single count of

14  material support for terrorism, that was Mr. Shah, and his plea

15  was a 15-year total and he got 15 years, again, as a result of

16  a negotiated plea with the government, just like Mr. Farhane

17  had, a negotiated plea with the government that capped his

18  exposure at 13 years.  The third defendant in this case, who

19  went to trial, got 30 years after conviction at trial.

20           So, the delta here was actually 10 years, not anything

21  less, and that is what his lawyer achieved for him.  His lawyer

22  knew about the problems with the informant.  He knew about

23  the --

24           THE COURT:  Did you find that that was not -- it would

25  have been -- this was not prejudiced, that he would have gone

1  to trial.  We still have to put ourselves in his own personal

2  situation and imagine that the alternative is being banished

3  from the country where he has six kids and a wife and a going

4  business.  It seems to me one might rationally choose -- it is

5  a low standard, one might rationally choose to be in a place

6  that he could be visited, than not.

7         MR. METZNER:  Your Honor, I don't agree that it is a

8  low standard, especially here, 18 years later after the plea,

9  for this Court to then go back and determine what the defendant

10  was thinking in 2006.

11         THE COURT:  Well, of course some of that delay was a

12  result that there was no denaturalization proceeding even on

13  the horizon when he pleaded guilty in 2006.  It wasn't until

14  2018 that this was a possibility.

15         MR. METZNER:  That is certainly when it was filed,

16  your Honor, no question about it.

17         JUDGE NATHAN:  You don't contend he could have filed

18  it sooner.

19         MR. METZNER:  I'm sorry, your Honor?

20         JUDGE NATHAN:  You don't contend, do you, that he

21  could have filed it sooner.

22         MR. METZNER:  Your Honor, we did not make any argument

23  about the statute of limitations, we did not.

24         JUDGE NATHAN:  Right.

25         JUDGE MENASHI:  If he had gone to trial and been

1   acquitted, could the government still have brought the

2   denaturalization proceeding because the burdens of proof are

3   different, beyond a reasonable doubt versus a preponderance?

4            MR. METZNER:  Yes, your Honor.  The only difference --

5            JUDGE MENASHI:  If he had gone to trial and was

6   acquitted, he still would not have avoided the denaturalization

7   consequence.

8            MR. METZNER:  That's correct.  The only --

9            THE COURT:  Counsel, if a non-citizen goes to trial

10  and is acquitted, can the government also proceed with removal

11  proceedings against them?

12           MR. METZNER:  Well, your Honor, not based on an

13  aggravated felony conviction, obviously.

14           THE COURT:  But they can proceed with removal

15  proceedings.  What we are talking about here is the fact that

16  the conviction alone is not the only way to deport someone.

17           MR. METZNER:  That's right, but that is sort of

18  reversing the issue that we are looking at.  The question is

19  whether what is the direct connection between a conviction if

20  you are going to plead guilty because this is about the advice

21  to plead guilty or not, and the resulting events.

22           THE COURT:  The fact that another option is available,

23  particularly where here where the denaturalization complaint

24  starts right out with:  He is indicted, he pled guilty, he is

25  convicted.  That's the thrust of the complaint.  The fact that

O5M5farA

1  the government has another position, that somehow undoes the

2  effect of guilty plea and conviction?

3          MR. METZNER:  It limits the linkage, your Honor.

4          In the aggravated felony non-citizen context, what the

5  government has to assert in the PFR is this person was

6  convicted of an aggravated felony.  And that's pretty much the

7  end of it.  But in this context what the government is saying

8  is that the linkage between the conviction and the event of the

9  denaturalization petition is not as well established because it

10  is the underlying events that lead to the denaturalization.  It

11  is proveably easier for the government, no question about it,

12  the collateral estoppel effect makes proving those facts easier

13  for the government, that is absolutely true.

14          JUDGE WESLEY:  Including the fact that he had done a

15  criminal act and then lied about it (unintelligible)

16  denaturalization proceedings would be by clear and convincing

17  evidence, whereas the conviction of the criminal act is

18  procured by beyond a reasonable doubt or his plea establishes

19  that fact but it doesn't preclude proving that he did a

20  criminal act and lied about it in a civil proceeding.

21          MR. METZNER:  That's right, your Honor.  That's why it

22  is not -- the connection between the two events simply isn't

23  the same, your Honor.

24          JUDGE WALKER:  And on the flipside, the fact about the

25  collateral estoppel if it is used against him doesn't

1   necessarily guarantee that he will be denaturalized.

2          MR. METZNER:  That is absolutely correct, your Honor.

3          JUDGE WALKER:  Because there would be all sorts of

4   reasons why he lied to the immigration officer that would be

5   justified; he couldn't remember, it would be embarrassing, that

6   kind of thing.

7          MR. METZNER:  Exactly.  And that is exactly the

8   defenses that are available.  And my colleague talked about

9   looking at the denaturalization petition.  Every one of those

10  defenses, your Honor, is reflected in the denaturalization

11  petition because of course the government asserts that they're

12  absent.  That is as you might expect.  The government asserts

13  that those defenses are absent but it shows that they are

14  there.  The need for the absence of extenuating circumstances

15  in Count One.  The need for the intent to obtain an immigration

16  benefit in Count Two.  The need to be willful and conceal a

17  material fact in Count Three, those are all alleged in the

18  petition itself, which the government has to overcome to

19  succeed in the denaturalization.  It is not just about his

20  conviction.

21         JUDGE NATHAN:  And that is why your success is

22  substantially greater with the conviction.

23         MR. METZNER:  Success in proving the facts, not about

24  the defenses though, your Honor.  Every defense I just

25  mentioned is not undermined by the fact that he has been

1    convicted of this offense.  He could argue extenuating

2    circumstances about the offense.  He could argue that he didn't

3    lie to obtain an immigration benefit.  He lied because he

4    didn't want the world to know that he had done these things.

5    There are all kinds of bases that are not affected by the

6    existence of the collateral estoppel effect.

7         JUDGE WALKER:  It is also important that the lies to

8    which he pled guilty were to the FBI, not to the immigration

9    authorities.

10         MR. METZNER:  That's correct, they are lies to the

11   FBI.  And the recording session pointed out -- my colleague

12   suggested that those were recordings by Mr. Al Ansi.  That is

13   not the case.  The recorded statements that are referenced in

14   the government's brief were from FISA tapes, FISA intercepts of

15   Mr. Farhane talking on the phone, not to the individual who had

16   all the problems which, by the way, Mr. Hueston knew all about

17   at the very beginning of this case and still recommended to his

18   client that he plead guilty and said, himself, that he knew of

19   no viable defense.

20         THE COURT:  If you concede --

21         THE COURT:  Please go ahead.

22         THE COURT:  If you concede that the government's proof

23   would be easier with the conviction, doesn't the fact that he

24   pled guilty then increase the risk of his denaturalization

25   which is the ultimate purpose of which is deportation?

1          MR. METZNER:  I don't agree because in this case it is

2     the linkage about the conviction itself and the result that

3     *Padilla* was focused on, otherwise it is a collateral

4     consequence.

5          THE COURT:  But it would certainly, in terms of the

6     government's discretion in initiating a civil denaturalization,

7     the ability to use a conviction would make that decision a much

8     easier one; correct?

9          MR. METZNER:  I have to respectfully disagree with

10     that, your Honor, because that suggests that the government

11     basically is looking for the easiest case to make and I don't

12     agree with that.

13          THE COURT:  I'm not suggesting the government wouldn't

14     when there isn't a conviction.  I am just saying doesn't that

15     factor into a decision?

16          MR. METZNER:  No, your Honor, it doesn't.  It has to

17     do with the discretion of -- to seek denaturalization is

18     committed to the good cause determination of every United

19     States Attorney's office since 1909.  The U.S. Attorney's

20     offices have been directed to look past the actual factors for

21     denaturalization and still decide whether it is in the benefit

22     of the citizenry -- is how the language worked in 1909 -- to

23     seek denaturalization.  Every single case is subject to that

24     level of discretion.  And only when it is appropriate to do so

25     for the benefit of the citizenry does a U.S. Attorney authorize

1 the following in light of an affidavit showing good cause to

2 believe that an individual is eligible for denaturalization.

3 So whether or not a conviction has been sustained or

4 whether simply the facts supporting the events behind the

5 conviction, either way, the discretion of the U.S. Attorney in

6 seeking denaturalization, I don't believe, frankly, your Honor,

7 is affected by whether they got a conviction.

8 If there are no further questions, we would ask that

9 you affirm the --

10 JUDGE SULLIVAN: I have a quick question.

11 You said there were three reasons, you said one, and

12 then you got interrupted. I assume we got to the other two but

13 what are they, for those of us who want to make sure.

14 MR. METZNER: Number two is that this would be a new

15 rule. That the Court was being asked to find a brand-new rule,

16 that is, to apply the advice requirement to the risk of

17 denaturalization. No matter how much the defendant wants to

18 call it a risk of deportation that is not what we are talking

19 about. The case law is incredibly clear that if you extend a

20 precedent, that makes a new rule. This is a new rule.

21 Third, your Honor --

22 JUDGE NATHAN: Sorry. That's a *Teague* argument?

23 MR. METZNER: Absolutely, your Honor.

24 JUDGE NATHAN: And two questions about that. Is it

25 right that Mr. Farhane raised this claim at the first

1  opportunity that he could?  Again, you have conceded there is

2  no statute of limitations.

3      MR. METZNER:  We don't argue that that is true, your

4  Honor.

5      JUDGE NATHAN:  The government did not raise *Teague* at

6  the first opportunity that it could; right?

7      MR. METZNER:  We didn't raise it in the district

8  court, your Honor; that is correct.

9      JUDGE NATHAN:  So under any principles of

10  non-retroactivity and finality, why would there be a waiver --

11  why would there be a forgiveness of that?  It seems to me

12  finality cuts against you, not for you.

13      MR. METZNER:  Not in this context, your Honor, because

14  it is not about finality.  We are defending the judgment below.

15  We are the appellee.  We can rely on any basis that supports

16  the judgment, including this one.  It does not matter and the

17  Supreme Court even said so.

18      JUDGE NATHAN:  It is your argument that we have

19  discretion to forgive your failure to raise it, it doesn't

20  provide a reason in order to.

21      MR. METZNER:  I respectfully disagree about forgiving

22  our failure, your Honor.  What is says is there is no

23  forfeiture at all, that the appellee can rely on any basis,

24  including one never raised below at all, to defend the judgment

25  in the appellate court and that is what we are doing.  It is

1    not about you forgiving the fact that we didn't do it, it is

2    about the fact that we are permitted to do it.

3            JUDGE MENASHI:  One reason we might decide reject is

4    because we decide it was waived, right?

5            MR. METZNER:  Well, again, I don't agree that it would

6    be waiver, your Honor.  You can decide not to address it.  You

7    can decide to address the merits of the case.

8            JUDGE MENASHI:  Why don't you say something about what

9    is the interest behind *Teague* that means we should overlook the

10   forfeiture and (unintelligible)

11           MR. METZNER:  That is because of the attack on

12   finality that a case like this brings.  You are talking about

13   reassessing the conduct of a lawyer in connection with a guilty

14   plea 18 years ago.

15           JUDGE NATHAN:  So we want to incentivize defendants to

16   bring those claims at the first opportunity that they can so it

17   can be, if they have an entitlement or right it can be

18   adjudicated and vindicated without the unnecessary passage of

19   time.  You have said that is not implicated here.

20           MR. METZNER:  Well, I should qualify that, your Honor.

21   There was an opportunity for Mr. Farhane to do it.  As the

22   Court recognized, his case was still pending with this Court

23   after *Padilla* was issued.  His attorney, who had been appointed

24   to represent him, had filed an *Anders* brief but the case was

25   still pending.  Once *Padilla* came out I don't think anyone can

1  argue that it got a lot of attention.  It was described as an

2  earth cake in connection with criminal defense work.  His

3  lawyer did not have any reason to believe that there was a

4  meritorious issue there and did not seek to amend his --

5         JUDGE WESLEY:  And this Court granted the *Anders*

6  application post-*Padilla*.

7         MR. METZNER:  That's correct, your Honor.

8         JUDGE WESLEY:  And granted summary affirmance to the

9  government.

10        MR. METZNER:  That's right.  And so --

11        JUDGE NATHAN:  But he didn't know yet --

12        JUDGE WESLEY:  Excuse me.  There was no application

13  for habeas, really, in the interim until the time that he was

14  released from prison; is that correct?

15        MR. METZNER:  That's correct, your Honor.  After the

16  government filed its denaturalization petition.

17        JUDGE NATHAN:  It was after the government filed its

18  denaturalization petition that he became aware that he was at

19  the risk of denaturalization because nobody had told this him

20  that before.

21        JUDGE WESLEY:  Well, had he -- while he was still in

22  prison, one would think, that he would have an interest in

23  overturning his conviction since it would set him free.

24        MR. METZNER:  I guess my point, your Honor, is that

25  even counsel he had at the time who had his case on direct

appeal, when *Padilla* came out, didn't recognize this as a

potential issue which goes directly to whether Mr. Hueston, in

2006, should have recognized this as a potential issue.

JUDGE NATHAN: I think we know you don't really think

that because you didn't argue that it is barred by the statute

of limitations so you don't -- you didn't contend that that is

a basis to conclude it really should be barred.

MR. METZNER: Well, your Honor, it is a basis however,

to conclude that no one rendered ineffective assistance on

behalf of Mr. Farhane. That not only did his trial counsel --

JUDGE NATHAN: That's not a *Teague* argument, that is a

merits argument.

MR. METZNER: Absolutely, right, your Honor, but the

finality is absolutely a *Teague*, and undermining convictions on

standards that apply today in 2024 based on conduct that

occurred in 2006 is exactly what the *Teague* doctrine exists to

preclude on collateral review, which is what this is.

JUDGE NATHAN: The direct appeals interfere with

finality, too, but we think that you have a right under the law

to bring them. I mean, just invoking finality doesn't say

anything, especially when the government was the one who didn't

bring that argument at the earliest possible opportunity. It

just seems to me that finality cuts --

MR. METZNER: Respectfully, your Honor, it is not

final until the direct appeal is over. So finality is defined

1    to include the whole period up to and including the resolution

2    of the direct appeal.  So finality is only effected after the

3    direct appeal is concluded and that's when the habeas motion

4    gets in the way and says, OK, we are going to look all the way

5    back.  And when you do that and create a new rule that requires

6    counsel to do something they have no basis to believe they had

7    to do at the time, that's violating the *Teague* doctrine.

8         My third point, your Honor, if I may, was simply that

9    there was no ineffective assistance here and I would like to

10   reiterate that if I could.

11        First of all, Mr. Hueston had no reason to believe

12   that he needed to go any further than what he already knew

13   which was that Mr. Farhane was a naturalized citizen.  There

14   was no reason -- he did not know and there was no reason under

15   the prevailing professional norms, for him to ask When was he

16   naturalized?  And what did you say on your naturalization

17   paperwork?  And whether your conduct overlapped with the

18   statements you made to the naturalization authorities.  There

19   was no reason to believe that Mr. Hueston knew any of that or,

20   that under the norms of the time, he had any reason to ask.

21        Further, Mr. Farhane suffered no prejudice.  As we

22   have talked about here, Mr. Hueston was well aware of the

23   deficiencies, so to speak, in the government's evidence with

24   respect to the informant setting himself on fire.  In fact, he

25   referred to that in the very first appearance that the

1   defendant had.  Nevertheless, after knowing all about all of

2   those risks and seeing the evidence that the government got

3   including some recordings that were not from Mr. Al Ansi,

4   Mr. Hueston recommended that the defendant plead guilty in

5   spite of all of that.

6          So, there really was no legitimate defense that

7   Mr. Farhane had to present at trial.  And Mr. Hueston

8   absolutely represented to him effectively and got him 10 years

9   less than he would have gotten, which was what he asked, which

10  what is Mr. Farhane had asked to do, which is to spend more

11  time with his family.

12         Unless the Court has further questions, we ask that

13  the judgment be affirmed.

14         THE COURT:  Thank you, Mr. Metzner.  We will go back

15  to Mr. Kassem for five minutes.

16         MR. KASSEM:  Thank you, your Honor.

17         Your Honor, my colleague makes much, argues that the

18  conviction is not sufficient to cause deportation, citing other

19  circuits and I want to be clear about this:  An immigration

20  judge in the Second Circuit would be bound to o order removal

21  based on this aggravated felony conviction.  That's under BIA

22  precedent, binding BIA precedent in *Gonzalez-Muro*, 2008, matter

23  of Rossi, 1963.  It is an open question in the Second Circuit.

24  But, even should it be resolved in someone like Mr. Farhane's

25  favor, Mr. Farhane would still be deportable based on conduct

1    that could be established via these vehicles including public

2    safety and national security grounds and terrorism-related and

3    admissibility grounds.

4         My colleague also makes much of the fact that there

5    are defenses to denaturalization.  Well, there are defenses to

6    deportation, too, and as far as the denaturalization grounds

7    alleged against Mr. Farhane we are, at present, not aware of

8    any viable defense to any of the three denaturalization counts.

9         To your question, Judge Kahn, about the trials --

10        JUDGE MENASHI:  You are not aware of any defenses?

11   Does that mean that we know that Mr. Farhane misrepresented his

12   conduct in order to procure an immigration benefit?

13        MR. KASSEM:  Your Honor, I will say that should the

14   convictions stand, we are not aware of any viable defense to

15   any of the three counts.  And to Judge Kahn --

16        JUDGE MENASHI:  There was going to be a trial defense

17   and might that not be extenuating circumstances on Count One.

18        MR. KASSEM:  No, your Honor.  Again, based on our

19   research at this time, we don't believe that would be viable

20   either, and there is certainly no case law nationwide to

21   indicate that it might be.  Judge Kahn's question --

22        THE COURT:  You did reserve, I thought I read in the

23   briefing, that you reserved some arguments --

24        MR. KASSEM:  Of course.

25        THE COURT:  -- to argue denaturalization.  So you are

1  not saying you wouldn't raise them, you are just saying they

2  wouldn't be successful?

3          MR. KASSEM:  Exactly.  We are not waiving them, but

4  based on our research today as sort of the case law exists

5  today.

6          The question about trials, your Honor.  My colleague

7  makes much of the state of mind of defense counsel, but really

8  what matters in the prejudice inquiry is the state of mind of

9  Mr. Farhane.  Mr. Farhane was not informed about these

10  consequences.  That would have informed whether or not he would

11  have rolled the dice on the defenses that were available to

12  him.  And again, Mr. Lee had no real defense at all.  The cases

13  that I was referencing were all cases that were sentenced in

14  2006 and 2007 *U.S. v. Yousry*, U.S. v. Stewart, *U.S. v. Sattar*,

15  a co-defendant was sentenced five years below the maximum, the

16  rest were sentenced concurrently, not consecutively.  It is on

17  that basis that we believe Mr. Farhane would have been capped

18  at 15.  But, frankly even if the delta were 10 years, then

19  Mr. Farhane would have taken his chances, it would only lead to

20   2255 affidavit, and looked to the fact that he is here in this

21  courtroom, he is asserting his claim and he is risking

22  additional time in prison.  What better proof would you need

23  than that?  *Padilla* itself refers to that as the significant

24  limiting principle that is built into the nature of the relief

25  that Mr. Farhane seeks because, from his posture, by seeking to

1    vacate, he faces retrial and he faces additional years in

2    prison and that is how much his citizenship, his presence in

3    this country with his family is worth to him.

4        JUDGE SULLIVAN:  You are saying he is prepared to go,

5    be retried, 18 years later?

6        MR. KASSEM:  Absolutely, your Honor.

7        JUDGE SULLIVAN:  And that could result in a higher

8    sentence under the guidelines; right?

9        MR. KASSEM:  Your Honor, that is exactly the

10   significant limiting principle that the Court referred to in

11   *Padilla*.  It is a risk that Mr. Farhane is aware of and, again,

12   is an indication of the depth of his attachment to his U.S.

13   citizenship and presence in this country.

14       Now, Judge Nathan, you raised the point about

15   misadvice and I just want to be very clear about this.  The

16   Supreme Court dedicated the entirety of Section 4 in *Padilla* to

17   this point.  The silence versus misadvice distinction simply

18   does not survive *Padilla* because it leads to absurd outcomes

19   including incentivizing silence of counsel.  *Chaidez* does not

20   say otherwise.

21       And, you know, Judge Wesley, you raised this question

22   about some relation to the criminal justice process and I think

23   that is exactly right in the sense that it is in line with

24   *Padilla* as we read it.  *Padilla* talks about the automatic

25   nature of the connection between the severe immigration

consequence and the criminal justice system and also describes

it in terms of a close connection to the criminal justice

process and interrelation, all of which is present here.  Now

maybe there is a difference in degree between what is happening

to Mr. Farhane and what happened to Mr. *Padilla* but it is not a

significant or determinative difference in kind.

Again, my colleague says that *Padilla* said that

deportation is unique.  I'm not sure where that is in the

opinion, but at any rate, the Supreme Court itself likened

denaturalization to deportation as early as now or in 1946.

These are the only two particularly severe immigration

consequences that have been likened by the Supreme Court.  The

Supreme Court has never mentioned any other consequence other

than denaturalization in the same breath as deportation.

JUDGE SULLIVAN:  But I guess the Supreme Court has

never blessed the direct collateral distinction that most other

circuits and state courts have embraced.  But I'm trying to

figure out, and you are not asking us to basically overturn

Second Circuit law relating to non-immigration-related

consequences.  But why not?  I mean, why wouldn't the threat of

civil commitment after a conviction be even more severe than

being deported is.

MR. KASSEM:  Well, your Honor, for civil commitment we

can look to cases like *Youngs* in this Circuit.

JUDGE SULLIVAN:  Yes.

1      MR. KASSEM:  For civil commitment, dangerousness is

2   assessed in real-time.  Right?  And there is a repeat

3   assessment that happens even after the point of civil

4   commitment where a person can argue and go to court and go

5   through a proceeding that might result in their liberation.

6   Denaturalization and deportation is final.  Once Mr. Farhane is

7   denaturalized and deported, there is no way back, he is subject

8   to a permanent inadmissibility bar, there are no waivers,

9   detention is mandatory.  It is a one-way street.  Whereas with

10   civil commitment, there is a recursive process that could lead

11   to the end of civil commitment.  The same is true for all of

12   these other collateral consequences.  If you look at case

13   law -- and we did nationwide -- the law is fairly well settled.

14   Denaturalization and deportation are in the same bucket.  The

15   Supreme Court has said so.  And if this Court would follow

16   *Padilla*'s logic, it would reach the same conclusion.

17      So, your Honor, if anything, the fact that

18   denaturalization and deportation risks rise together in this

19   case should really reinforce Mr. Farhane's claims to the Sixth

20   Amendment's protections, not underline it.  And affirmance

21   here, to quote the Supreme Court's 1964 *Costello* decision,

22   would put Mr. Farhane in a much more disadvantageous position

23   than he would have occupied if he had never naturalized at all.

24   And that simply cannot be the law.

25      JUDGE WALKER:  You addressed (unintelligible)gain we

1    have to deal with *Strickland* which is a different calculus and

2    different set of facts.  That's the situation to concentrate on

3    right now because even if he were to prevail on the Sixth

4    Amendment point you would still have *Strickland*.  And where is

5    the performance violation or unreasonable performance conduct

6    on the part of the attorney given the circumstances and what

7    was known in terms of standards in 2006.

8              MR. KASSEM:  So, your Honor, in terms of case law, I

9    cited cases that were available to counsel in 2006:  Standards

10   Tooby, the IDP resource cited in our brief.  The information

11   was out there.  As far as case-specific information --

12             JUDGE WALKER:  Tooby doesn't deal with lawyers, it

13   deals with the fact.  It simply states the fact that as a

14   naturalized citizen you could be denaturalized.

15             MR. KASSEM:  Actually, the Tooby treatise was well

16   respected and cited by the Supreme Court because Mr. Tooby,

17   himself, was a well-respected practitioner.  It has all sorts

18   of advice for practitioners in that treatise itself.

19             As far as the information what, regarding Mr. Farhane,

20   again, trial counsel knew all that he needed to.  He knew that

21   Mr. Farhane was a naturalized citizen.  He knew that the

22   conduct alleged was serious and was years old, and he knew or

23   should have known that he was advising a plea to

24   pre-naturalization conduct.  And if he didn't know that -- and

25   I think it is fair to infer that he did know that, he certainly

1  knew that by January 2007 because it is in the presentencing

2  report.  But, even if he didn't know that earlier, it is only

3  an additional question and it is unreasonable for a defense

4  lawyer not to ask the question, Well, when did you become a

5  U.S. citizen?  Because at that point you have absolutely all

6  the information you need to connect the dots.  And if, again --

7          JUDGE SULLIVAN:  But you are also then saying that

8  appellate counsel was ineffective as well, right?

9          MR. KASSEM:  No, your Honor.  We are making no claims

10  as to appellate counsel.

11          JUDGE SULLIVAN:  How can you not say that?  I mean,

12  appellate counsel must have also known that he was a

13  naturalized citizen.  By then *Padilla* had come out.  It would

14  seem to me how could you not reach the same conclusion?

15          MR. KASSEM:  Well, your Honor, the reason why we don't

16  take issue with what appellate counsel did was it was on direct

17  appeal and generally the preference is for ineffective

18  assistance of counsel claims to be raised collaterally under

19  2255.  Now, of course, the Second Circuit is a bit of an

20  outlier in that regard, the *Morrison* case gives this Court the

21  option to entertain ineffective assistance claims on direct

22  appeal but it rarely does so.  Really, the case sets out three

23  pathways.  Remand is usually what happens.  In every other

24  circuit 2255 is the path, and that was the path that was taken

25  here.  But I think his Anders counsel may have been under the

O5M5farA

1    understanding that you don't raise ineffective assistance

2    claims on direct appeal, you raise them -- because that's the

3    state of the law in most every other circuit.

4            Are there any other questions?  If there are no

5    further questions --

6            JUDGE SULLIVAN:  I think we got our money's worth.

7            MR. KASSEM:  Thank you, your Honor.

8            JUDGE SULLIVAN:  I am making a joke.  It is obviously

9    a serious case.  Thank you for the well argued case and

10   well-briefed.  We will reserve decision.

11                              o0o

12

13

14

15

16

17

18

19

20

21

22

23

24

25